**UNITED STATES of America, Appellee,**

v.

**Jorge Armando AGUILAR–PENA, Defendant, Appellant.**

**No. 88–1477.**

United States Court of Appeals, First Circuit.

Heard Sept. 11, 1989.

Decided Oct. 12, 1989.

---

Francisco R. Moya Huff, Hato Rey, P.R., for defendant, appellant.

Jose R. Gaztambide, Asst. U.S. Atty., with whom Daniel F. Lopez Romo, U.S. Atty., San Juan, P.R., was on brief, for U.S.

Before SELYA, Circuit Judge, COFFIN and FAIRCHILD *, Senior Circuit Judges.

SELYA, Circuit Judge.

This appeal requires that we review a sentence in order to determine whether the district court appropriately departed from the sentencing guidelines promulgated pursuant to the Sentencing Reform Act of 1984, as amended, 18 U.S.C.A. §§ 3551–3586 (West 1985 & Supp.1988); 28 U.S.C.A. §§ 991–998 (West Supp.1988). Because we believe that the court acted impermissibly, we vacate the sentence and remand for further proceedings.

## I. BACKGROUND

On November 5, 1987, Lufthansa Flight 535 made a scheduled stop at Puerto Rico's international airport enroute from Colombia to Frankfurt, West Germany. Defendant-appellant Jorge Armando Aguilar-Pena (Aguilar) was aboard. Much to Aguilar's chagrin, customs officials conducted an inspection of in-transit passengers. Based upon his "vague responses" and "nervous demeanor," Aguilar was referred to a secondary inspection, which revealed that he was carrying cocaine. Detention and indictment followed. The indictment charged: count 1—importation of cocaine into the United States, 21 U.S.C. § 952(a); count 2—possession of cocaine with intent to distribute it, 21 U.S.C. § 841; count 3—possession of undocumented cocaine on an aircraft "arriving in" the United States, 21 U.S.C. § 955.[1]

* Of the Seventh Circuit, sitting by designation.

1. Inasmuch as count 3 implicates the statute of conviction, *see infra,* we set out the statutory text in material part:

Pursuant to a nonbinding plea agreement, *see* Fed.R.Crim.P. 11(e)(1)(A), defendant admitted guilt as to count 3. The district court, following standard convention, *see* Fed.R.Crim.P. 32(c), requested a presentence investigation report (PSI Report). When received, the PSI Report indicated that the "base offense level" corresponding to the statute of conviction was 18; the "total offense level", net of applicable adjustments (most significantly in this case, defendant's acceptance of responsibility), was 16; and the criminal history category was I (no prior record). Based on these conclusions, the probation officer used the grid and fixed the "sentencing range" at 21–27 months. *See United States Sentencing Commission Guidelines Manual (Manual)* § 1B1.1 at 1.13 (rev. ed. 1988); *see also United States v. Diaz–Villafane*, 874 F.2d 43, 47–48 (1st Cir.1988) (explaining method of computation under guidelines); *United States v. Wright*, 873 F.2d 437, 440 (1st Cir.1989) (similar). The probation officer also stated that he had "not identified any information that would warrant a departure from the guidelines."

The district court held a sentencing hearing. No new information surfaced. The court accepted the computational conclusions contained in the PSI Report, but departed from the guidelines and sentenced Aguilar to a prison term of 48 months, *United States v. Aguilar–Pena*, 696 F.Supp. 781, 782 (D.P.R.1988), simultaneously dismissing counts 1 and 2 of the indictment.

On appeal, defendant's argument is one-dimensional. He does not object to the court's assessment of the sentencing range, or to any of the antecedent calculations upon which that assessment rested. Rather, defendant's sole contention is that the district court had no legally sufficient basis for disregarding the guidelines. We are constrained to agree.

It shall be unlawful for any person to bring or possess on board any vessel or aircraft, ... arriving in or departing from the United States or the customs territory of the United States, a controlled substance ... or a narcot-

## II. DEPARTURE FROM THE GUIDELINES: IN GENERAL

We begin by tracing the interrelationship between the guidelines and the district courts' ability to go above the applicable sentencing range. We then proceed to discuss appellate review of departure decisions, again in general terms. In Part III, *infra*, we turn to the departure decision in this case.

### A. *Departures.*

Inasmuch as the root purpose of the guidelines "is to provide a structure for evaluating the fairness and appropriateness of the sentence for an individual offender," S.Rep. No. 225, 98th Cong., 2d Sess., *reprinted in* 1984 U.S.Code Cong. & Admin.News 3182, 3235, each guideline should be seen "as carving out a 'heartland,' a set of typical cases embodying the conduct that [the] guideline describes." *Manual* Ch. 1 Pt. A § 4(b) at 1.6. It is only when the case before the court falls outside the "heartland" that departure comes into play.

Under the Sentencing Reform Act, a district court may depart from the guidelines if it "finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." 18 U.S.C.A. § 3553(b); *see generally Diaz–Villafane*, 874 F.2d at 49; *United States v. Russell*, 870 F.2d 18, 19 (1st Cir.1989) (per curiam). Departure is permitted in those cases where idiosyncratic circumstances warrant individualization of sentence beyond that which is possible within the comparatively close-hewn parameters constructed by the guidelines. Such circumstances are those which "cannot, by their very nature, be comprehensively listed and analyzed in advance." *Manual* § 5K2.0 at 5.36. And because de-

ic drug ... unless such substance or drug is a part of the cargo entered in the manifest ... of the vessel [or] aircraft....
21 U.S.C. § 955 (1982).

partures are meant to be the exception, not the rule, *Diaz–Villafane,* 874 F.2d at 52, there must be something "special" about a given offender, or the accouterments of the crime committed, which distinguishes the case from the mine-run for that offense. "When a court finds an atypical case, one to which a particular guideline linguistically applies but where conduct significantly differs from the norm, the court may consider whether a departure is warranted." *Manual* Ch. 1 Pt. A 4(b) at 1.6.

Whether departure is appropriate, then, depends in part upon whether, in drafting the guidelines, the Sentencing Commission took into account the factors subsequently relied upon by the sentencing court as grounds for departure. *See United States v. Uca,* 867 F.2d 783, 786 (3d Cir.1989). Put bluntly, "where the applicable guidelines, specific offense characteristics and adjustments do take into consideration a [particular] factor ..., departure from the guideline is warranted only if the factor is present to a degree substantially in excess of that which ordinarily is involved in the offense of conviction." *Manual* § 5K2.0 at 5.36–5.37.

### B. *The Anatomy of Review.*

■ In reviewing the legitimacy of departures from the guidelines, we engage in a three-tier analysis. *See Diaz–Villafane,* 874 F.2d at 49. First, we evaluate the circumstances relied on by the district court in determining that the case is sufficiently "unusual" to warrant departure. If the stated circumstances pass muster, we proceed to the next rung and determine whether those circumstances were adequately documented. After the first two levels are climbed, the departure must be measured by a standard of reasonableness. *Id.* On the third tier, the district court's leeway is substantial. At that stage, "[w]e read the Guidelines as envisioning considerable discretion in departure decisions ... [and] defer, within broad limits, to the trial judge's intimate familiarity with the nuances of a given case." *Id.* at 52. On the first two steps, however, discretion is not the issue.

■ In determining whether the circumstances recounted by the district court as warranting departure were properly considered, our review is plenary. "[W]hether or not circumstances are of a kind or degree that they may appropriately be relied upon to justify departure is ... a question of law." *Diaz–Villafane,* 874 F.2d at 49; *accord Uca,* 867 F.2d at 786.

*Diaz–Villafane* furnishes an illustration of a set of appropriate considerations. There, the myriad factors on which upward departure was predicated—*e.g.,* the pendency of other (unrelated) trafficking charges against defendant; his use of children to deliver drugs; the amount of money involved in defendant's illicit ventures; the unusual purity of the heroin, *see* 874 F.2d at 50–51—could not adequately have been taken into account by the Sentencing Commission in formulating the guideline for the offense of conviction. Elements of this sort were not typical of the crime or, if typical, were present in Diaz–Villafane's case to a degree much greater than the norm. These idiosyncratic factors had clear relevance to the advisability of abandoning the guidelines and represented, almost archetypically, the sort of embellishments the Commission had in mind as conditions precedent to departure. *See also United States v. Joan,* 883 F.2d 491, 494–495 (6th Cir.1989) (where offender's history of violence "sufficiently unusual," upward departure permissible) (adopting *Diaz–Villafane* standard).

■ Where such unusual circumstances exist, the district court possesses wide discretion in determining that upward departure may be warranted. *See Diaz–Villafane,* 874 F.2d at 52; *United States v. Sturgis,* 869 F.2d 54, 56–57 (2d Cir.1989); *United States v. Correa–Vargas,* 860 F.2d 35, 37 (2d Cir.1988); *see also United States v. Ryan,* 866 F.2d 604, 609 (3d Cir.1989); Manual § 5 K2.0 at 5.36 ("The controlling decision as to whether and to what extent departure is warranted can only be made by the court at the time of sentencing."). In no other way can society be assured that the punishment will fit the crime. But in the absence of indicia of atypicality, depar-

ture cannot be sanctioned. Giving judges free rein to forsake the guidelines in cases falling within the heartland for a given offense would be tantamount to judicial repudiation of the Sentencing Reform Act and the important policies which propelled its enactment.

## III. THE MERITS

■ We now proceed to the core issue raised by this appeal. Pursuant to 18 U.S.C.A. § 3553(c)(2), the court below set forth the reasons for its upward departure. *Aguilar–Pena*, 696 F.Supp. at 782. We extrapolate the following points from the court's discourse:

1. "It is a well-known fact in this community [San Juan] that Puerto Rico is being utilized by South American drug traffickers as a convenient stopover point for the distribution of narcotics into the Continental United States and other places in the world via commercial, scheduled airline flights." *Id.*

2. "[D]eparture from the guidelines is warranted in order to discourage the utilization of the Puerto Rico International Airport, an airport with lesser law-enforcement capabilities than those in the mainland, as a connecting point for international narcotics trafficking and/or for introduction of narcotics into the Continental United States." *Id.* The court also limned the ways in which Puerto Rico's airport was different from, and less secure than, airports in Miami and New York.

3. "Sentence within the guidelines in a case of this nature would also be in violation of the Puerto Rico public sentiment, feelings, and mores regarding this type of crime." *Id.*

The district judge's rationale, then, centered primarily around two items: (1) Puerto Rico is particularly susceptible to, and suffers disproportionately from, this type of criminal behavior; and (2) local antipathy toward the crime is correspondingly great. Although we sympathize with the judge's concerns, we believe that the guidelines do not allow departures for reasons such as these.

The basic flaw in the district court's reasoning is that it depends entirely upon the mere commission of the offense of conviction. The district court did not advert to, or rely upon, anything "different" about this case; to the exact contrary, the court's remarks would be equally applicable to *any* violation of 21 U.S.C. § 955 committed by *any* person, so long as it occurred in a Puerto Rican airport. Because the grounds for departure derived their essence from the offense itself, not from idiocratic circumstances attendant to a particular defendant's commission of a particular crime, the grounds, virtually by definition, fell within the heartland.

The district court's attempt to use the locus of the offense as a differentiating circumstance does not ameliorate the situation. To be sure, in attempting to salvage the sentence, one can point to the enabling legislation wherein Congress directed that:

The Commission, in establishing categories of offenses for use in the guidelines and policy statements governing the imposition of sentences ... shall take ... into account ... only to the extent that they do have relevance ... the community view of the gravity of the offense; ... the public concern generated by the offense; ... the current incidence of the offense in the community and in the Nation as a whole.

28 U.S.C.A. § 994(c)(4), (5), (7). The prosecution argues, in effect, that Congress wanted judges to take note of public opinion. But, this asseveration cannot withstand scrutiny. In the first place, Congress did not direct sentencing judges to become the arbiters of community sentiment; Congress directed *the Commission* to consider such matters, and then, "only to the extent ... relevan[t]." Mindful of the explicitness of the congressional mandate, we have no reason to believe that the Commission failed to consider such community-related factors.

There is, of course, a further, more fundamental point: we simply do not believe that the statutory language can possibly mean that a district court may override the guidelines merely because the crime was

perpetrated locally or on the strength of popular sentiment vis-a-vis the class of felony involved. As we have indicated, the operative words of the statute are "to the extent ... relevan[t]." These words have an especially profound significance because of the historical antecedents of sentencing reform. Given the oft-stated importance of eliminating disparity in sentencing, the degree to which local feelings may be infused into any sentencing decision is necessarily limited. We explain briefly.

Sentencing reform came about in response to "frequent criticism of the broad discretion afforded federal judges in sentencing [which] led to disparate treatment for similarly situated individuals." Ogletree, *The Death of Discretion? Reflections on the Federal Sentencing Guidelines*, 101 Harv.L.Rev. 1938, 1944 (1988). Clearly intending to cure this malady and "to reduce 'unjustifiably wide' sentencing disparity," Breyer, *The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest*, 17 Hofstra L.Rev. 1, 4 (1988), Congress created the Sentencing Commission. In so doing, Congress specifically stipulated that the Commission's mission was to "provide certainty and fairness in meeting the purposes of sentencing, avoiding unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar criminal conduct...." 28 U.S.C.A. § 991(b)(1)(B). It is no exaggeration, therefore, to say that the birth of the Sentencing Commission was to some extent reflective of Congress's ardent desire to dispense with inequalities based on localized sentencing responses.[2]

The Commission itself found that, in the pre-guidelines era:

> The region in which the defendant is convicted is likely to change the length of time served from approximately six months more if one is sentenced in the

South to twelve months less if one is sentenced in central California.... [B]lack [bank robbery] defendants convicted ... in the South are likely to actually serve approximately thirteen months longer than similarly situated bank robbers convicted ... in other regions.

Hearings on Sentencing Guidelines Before the Subcomm. on Criminal Justice of the House Comm. on the Judiciary, 100th Cong., 1st Sess. 554, 676–77 (1987) (testimony of Commissioner Ilene H. Nagel); *see also Manual*, Introduction at 1.2 ("Congress sought *uniformity* in sentencing by narrowing the wide disparity in sentences imposed by different federal courts for similar criminal conduct by similar offenders."). The Commission designed the guidelines to achieve a desired degree of uniformity, thus eradicating disparate sentences.

Adoption of the district court's site-specific focus would work against these ends and undermine the very foundation of the guidelines. If district judges have unbridled license to take community opinion and the incidence of particular types of crime into account in passing sentence, then any semblance of national uniformity in sentencing is little more than a mirage. Communities will be set against each other in an effort to show that their citizens are less tolerant of antisocial behavior than their neighbors.[3] In a nutshell, departure standards allowing district courts to override the guidelines by resort to sectional problems or local sentiment, with the result that equally blameworthy criminals will receive markedly different sentences depending on where their crimes occurred, would serve only to foster the very kind of wide variations in sentence severity which Congress apparently abhorred. Because both Congress and the Commission plainly intended the guidelines to be a means of

---

**2.** We recognize, of course, that Congress' concern with what we have termed "localized sentencing responses" included an interest in curbing disparities generated by predilections of individual judges.

**3.** We are reminded of Judge Aldrich's ringing statement, written well before the guidelines

were promulgated: "That federal judges, countrywide, should try to outbid each other in high sentencing is ... not a pretty picture.... [and] it is contrary to all principles of criminal sentencing...." *United States v. Samalot Perez,* 767 F.2d 1, 6 (1st Cir.1985) (Aldrich, J., concurring).

eliminating regional disparity in sentencing, departures based upon public opinion or the perceived incidence of one type of crime in a certain locality cannot be countenanced.[4]

In concluding that grounds for departure must be specific to the particular defendant's commission of a particular offense under a particular set of circumstances, we draw substantial support from the examples which the Commission offered as warranting the occasional departure. They include complicating factors such as, *inter alia,* death of the victim, severe property damage, and other forms of "extreme" conduct. *Manual* § 5K2.0 at 5.37–5.40. These exemplars make it crystal clear that, while the Commission envisioned upward departures based upon factors not specifically enumerated by it, *see id.* at 5.36, it intended the grounds for departure to be specific to the offender and the offense, rather than of relatively general application.

When, as here, a district court departs from the guidelines in reliance on factors adequately evaluated in the formulation of the guidelines, its "ruling indicates dissatisfaction with the guidelines rather than a reasoned judgment that particular characteristics of the offense … have not been accounted for." *United States v. Nuno–Para,* 877 F.2d 1409, 1414 (9th Cir.1989). Judicial dissatisfaction alone, no matter how steeped in real-world wisdom, cannot be enough to trigger departures, lest the entire system crumble. *See United States v. Lopez,* 875 F.2d 1124, 1126 (5th Cir.1989). Where the guidelines have taken matters into account, the district court is not then at liberty to depart, *see United States v. Palta,* 880 F.2d 636, 639–40 (2d Cir.1989); *Nuno–Para,* 877 F.2d at 1414, notwithstanding that the judge's independent weighing of the relevant factors might differ substantially from the Commission's.

Times have changed. Under existing law, district courts, in passing sentence, no longer write on a blank page, circumscribed only by the statutory limits appertaining directly to the offense of conviction. "The guidelines were formulated pursuant to a constitutional delegation of power by Congress, and the sentencing court is required to impose a sentence through application of the guidelines, unless there exists a valid basis for departure." *Lopez,* 875 F.2d at 1126.

In the case at bar, the record reveals no circumstances which would support an upward departure. This was a paradigm section 955 offense, a case well within the heartland. In abandoning the guidelines, the district court relied not on the individualized circumstances of Aguilar's particular case, but on a general aversion to a type of drug trafficking scheme too often practiced in Puerto Rico. Such a departure promotes regional disparity in sentencing, thus flying in the teeth of the guidelines. We cannot permit so parochial an approach to prevail.

## IV. CONCLUSION

We need go no further. Finding, as we do, that in this case the circumstances relied upon by the district court were insufficient to warrant departure, we stop on the first rung of the ladder. Aguilar's appeal is sustained. His sentence must be vacated and the cause remanded for resentencing within the applicable guideline range.

*Vacated and remanded.*

---

**4.** Congressional emphasis on curbing unequal treatment in sentencing also reinforces our conclusion, *see supra* at 351 & note 2, that the Commission should be deemed to have considered community sentiment to the extent relevant. We agree with the Third Circuit that, "in exercising our review function on the question whether the Commission adequately took certain factors into consideration, [an appellate] court should respect the overriding congressional purpose of reducing sentencing disparity and achieving general uniformity of treatment." *United States v. Uca,* 867 F.2d at 787.