**UNITED STATES, Appellee,**

v.

**Michael Neal LAUZON, Defendant, Appellant.**

**No. 90–1661.**

United States Court of Appeals, First Circuit.

Heard April 1, 1991.

Decided July 16, 1991.

---

Laurie Ann Miller with whom Ferris, Dearborn & Willey, were on brief, Brewer, Me., for defendant, appellant.

Margaret D. McGaughey, Asst. U.S. Atty., with whom F. Mark Terison, Asst. U.S. Atty., Portland, Me., and Richard S. Cohen, U.S. Atty., were on brief, Augusta, Me., for appellee.

Before BREYER, Chief Judge,
BOWNES, Senior Circuit Judge, and
TORRUELLA, Circuit Judge.

BOWNES, Senior Circuit Judge.

Michael Neal Lauzon appeals the sentence imposed upon him following his guilty plea to two counts of distributing LSD and one count of distributing psilocin in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C). Lauzon received a 63–month sentence, the minimum sentence available within the guideline sentencing range. The main issue on appeal is whether the sentencing judge understood that he had authority to depart downward under U.S.S.G. § 5K2.13, which provides:

> If the defendant committed a non-violent offense while suffering from significantly reduced mental capacity not resulting from voluntary use of drugs or other intoxicants, a lower sentence may be warranted to reflect the extent to which reduced mental capacity contributed to the commission of the offense, provided that the defendant's criminal history does not indicate a need for incarceration to protect the public.

U.S.S.G. § 5K2.13, p.s.

I.

Lauzon was twenty years old when he was arrested as a result of an investigation conducted by the Bureau of Intergovernmental Drug Enforcement (BIDE). BIDE was investigating a loosely-related group of ten to twelve young men whom it believed had been following the Grateful Dead band across the country, supporting themselves and their use of drugs through the distribution of illegal narcotics, particularly LSD. Two agents and a confidential informant arranged five drug transactions with Lauzon. These transactions resulted in a five-count indictment being returned against him.

Lauzon entered into a plea agreement with the government under which he pled guilty to three of the five counts. He was sentenced under the Sentencing Reform Act of 1984. 18 U.S.C. § 3551, *et seq.*

The LSD was sold in blotter paper that had been impregnated with LSD. The probation department included the weight of the blotter paper in its calculation of the weight of the LSD; this approach was adopted by the district court.[1] Using this method of computation, it was calculated that Lauzon sold a total of 1.68 grams of LSD, which corresponds to 168 grams of heroin under the drug equivalency table found at U.S.S.G. § 2D1.1. Lauzon also sold 33 grams of mushrooms containing psilocin, which translates to .033 grams of heroin under the drug equivalency table. The total amount of drugs corresponds to a base offense level of 26 under the drug quantity table U.S.S.G. § 2D1.1(c)(9). Lauzon received a two-level downward adjustment for acceptance of responsibility, U.S.S.G. § 3E1.1, establishing a total offense level of 24. As Lauzon had no prior criminal record for guidelines purposes, he fell within criminal history category I. Application of the total offense level to the criminal history category resulted in a Guideline Sentencing Range (GSR) of 63 to 78 months.

The presentence investigation report (PSI) notes that testing during Lauzon's elementary school years showed that he had "a significant central auditory process-

---

1. The defendant argued that LSD-impregnated blotter paper is not a mixture or a substance within the meaning of those terms under 21 U.S.C. § 841(b)(1)(A)(v) and (B)(v) and the sentencing guidelines. The Supreme Court has recently decided that blotter paper impregnated with LSD is a carrier medium under § 841(b) and that the weight of the blotter paper must therefore be included in determining the appropriate sentence. *Chapman v. United States,* —— U.S. ——, 111 S.Ct. 1919, 114 L.Ed.2d 524 (1991). The district court's determination of the weight of the LSD was, in effect, approved by the Court and that issue is now moot.

ing problem that led to a learning disability. This was apparently confounded [sic] by Michael's general intelligence tests at a borderline level in the 65 to 75 range. An evaluation of the defendant performed at counsel's request in December 1989 confirms earlier testing of intellectual level...." The PSI states that Lauzon appeared to "present the fact set which suggested policy statement 5K2.13," specifically that "[t]he defendant's borderline intelligence, which limits his ability to distinguish peers' motivation and makes him peculiarly vulnerable to following others' activities without discerning their intent, renders him a 'follower,' limiting his capacity to avoid difficulties."

At the sentencing hearing the defendant introduced the report of Dr. Frank A. Wood, a clinical psychologist, who had performed a competency evaluation of Lauzon pursuant to an order of the magistrate. This evaluation had been performed to determine whether Lauzon was competent to stand trial and whether his mental condition affected his criminal responsibility. Dr. Wood's report indicated that the defendant tested between the retarded and the borderline category of intelligence, but noted that "[b]ecause of his functioning, [Dr. Wood] would strongly expect the defendant to be of borderline intelligence." Dr. Wood also found that Lauzon understood the difference between right and wrong and that there was no indication "that the defendant had any particular mental problems at the time" that he committed the offense.

In a letter to defendant's counsel, which was also admitted at the hearing, Dr. Wood indicated that Lauzon had "obtained an Age Equivalent of 11 years, 4 months and a Standard Score (IQ) of 68" on the Peabody Picture Vocabulary Test—Revised (Form L). Based on the "confidence band" for the test, Dr. Wood estimated that Lauzon's IQ fell within a range of 66–80, with 70 being the break between mildly retarded and borderline intelligence. Dr. Wood reiterated that he felt, based on talking with Lauzon, "that he more likely falls in the borderline range of intelligence...." Dr. Wood said that the defendant was an "easy sell" and that he "could easily be coerced

or convinced to participate in an unwise activity."

William Tanner, who identified himself as "the director of the Community Correctional Service program, a seven-county consortium of sheriff's offices, federally funded under the Drug Enforcement Bill, to provide substance abuse and other services to probation and parole clients," addressed the court informally. Tanner and his staff had been working with Lauzon for about eight months. Like Dr. Wood, Tanner observed that Lauzon "has difficulty acting independently" and "is very easily persuaded." He stated that Lauzon relied so heavily on his family that "it became almost impossible for Michael to make decisions on his own."

Tanner said that Lauzon was faithfully participating in his treatment program, benefitting from it, and showing much improvement. He also stated that he had "serious concerns for Michael if incarcerated." Because of Lauzon's diminished capacity to understand, Tanner felt that Lauzon would be victimized within the penal system. Tanner said that he had a "structured day-treatment type program" available that would accept Lauzon immediately, and that he was willing to work with the probation officer to implement a program for him.

The defendant's mother also addressed the court. She said that Michael had been involved in an automobile accident when he was sixteen months old and that he had been diagnosed improperly.

> He was only diagnosed as having a speech and hearing impediment; but we now know that his problems were much deeper than that. And throughout the years, we noticed that he did not develop like my other children.

> He always had a hard time in school. He was very withdrawn, depended on everyone else to do everything for him. And all I want to say is that I'm very angry for what's happened to my boy. What other people have done to him,

knowing his child-like and simple ways. They used him.

\* \* \* \* \* \*

He knows right from wrong. Even an 11–year old child knows right from wrong. But I think he was led by these other people who were in with this drug problem.

The court next heard argument from counsel. Defendant's counsel argued that a departure from the GSR was warranted not only because the defendant's diminished mental capacity contributed to the commission of the offense, but also because it would lead to victimization of the defendant in prison.

While recognizing that "a 63 month sentence is admittedly a harsh sentence for a person such as Michael Lauzon," and that "Michael Lauzon is an appropriate person for leniency," the government argued that Lauzon was not an atypical defendant and that the guidelines required sentencing within the GSR. The government conceded that Lauzon's mental condition should be considered in determining the sentence within the guideline sentencing range and recommended the lowest possible sentence within the guidelines.

The court, after taking an extra day to consider the issue fully and study the materials submitted, held that it had "no defensible basis to depart from these guidelines" and sentenced the defendant to 63 months, the minimum sentence within the guideline range.

## II.

■ The defendant argues that the sentencing judge committed error by refusing to invoke § 5K2.13 as a basis for departing downwards from the sentencing guideline.

■ The government claims that we lack jurisdiction to review the sentencing court's decision not to depart. Its position is based upon the well-accepted rule that unless the decision involves an incorrect application of the Guidelines or is otherwise in violation of the law, a district court's discretionary refusal to depart downward is not appealable. *See United*

*States v. Jiminez–Otero*, 898 F.2d 813, 815 (1st Cir.1990); *United States v. Tucker*, 892 F.2d 8, 11 (1st Cir.1989). Where, however, a district court fails to depart because it feels that it is not authorized to do so, its decision is not an exercise of discretion, but an interpretation of law. We exercise plenary review over the district courts' interpretations of law. *United States v. Aguilar–Pena*, 887 F.2d 347, 350 (1st Cir.1989); *United States v. Diaz–Villafane*, 874 F.2d 43, 49 (1st Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 177, 107 L.Ed.2d 133 (1989). We have appellate jurisdiction where it is unclear whether a district court's refusal to depart was based on an exercise of discretion or based upon the district court's finding that it could not depart as a matter of law. *See United States v. Russell*, 870 F.2d 18 (1st Cir.1989) (per curiam).

■ While the policy statements found at §§ 5K2.0–5K2.15 give guidance to the district courts as to when departures may be appropriate, district courts are not required to depart where a case fits one of the sections, as the defendant seems to argue. These sections present a non-exhaustive list of occasions when a district court *may* depart at its discretion. U.S. S.G. § 5K2.0, p.s. Discretionary refusals to depart downward based upon § 5K2.13, are, as with all such discretionary refusals, not appealable. *See, e.g., United States v. Harotunian*, 920 F.2d 1040, 1044 (1st Cir. 1990); *United States v. Davis*, 919 F.2d 1181, 1187 (6th Cir.1990); *United States v. Kuntz*, 908 F.2d 655, 658 (10th Cir.1990); *United States v. Follett*, 905 F.2d 195, 197 (8th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 2796, 115 L.Ed.2d 970 (1991); *United States v. Ghannam*, 899 F.2d 327, 328 (4th Cir.1990). But a district court's failure to depart based on a finding that it does not have the authority to do so under § 5K2.13 implicates appellate jurisdiction. *United States v. Fox*, 930 F.2d 820, 824 (10th Cir.1991); *United States v. Ruklick*, 919 F.2d 95, 97 (8th Cir.1990).

The facts of the instant case are remarkably similar to those in *Ruklick:*

Ruklick presented evidence that his offense resulted, in part, from emotional

difficulties stemming from a childhood illness. As a result of this illness, Ruklick withdrew from his peer group and ultimately sought refuge in musical subcultures. By seventh grade, Ruklick had developed an obsession with the Grateful Dead, a rock band that reportedly sanctioned illegal drug use. According to one psychological expert, Ruklick, age twenty-one, functioned at the level of a twelve-year-old. Additionally, this expert opined that Ruklick suffered from a long-standing schizoaffective disorder that anteceded drug abuse and impaired Ruklick's judgment.

919 F.2d at 96–97.

The district court found that Ruklick had been shown by " 'reliable and convincing evidence to have a significantly reduced mental capacity.' " *Id.* at 97. It also found that this reduced mental capacity was not the " 'but for' " cause of the offense. *Id.* The district court, therefore, refused to invoke § 5K2.13 as a basis for departure. The Eighth Circuit, noting that § 5K2.13 does not require that the diminished capacity be the sole cause of the offense, *id.* at 98, reversed, holding that the "district court erroneously underestimated its authority to consider a downward departure based on the contributory effect of Ruklick's diminished mental capacity." *Id.*

■ We agree that § 5K2.13 does not require that reduced mental capacity be the "but-for" or "sole" cause of the offense. The key words of the section are: "a lower sentence may be warranted to reflect the extent to which reduced mental capacity contributed to the commission of the offense...." This means, as we interpret it, that the reduced mental capacity of a defendant must have contributed to *some* extent to the commission of the offense.

### III.

We now examine the comments that the district judge made at the sentencing hearing to determine if he understood that he had authority to depart under § 5K2.13. After hearing argument from defense counsel urging a downward departure, the judge said to the prosecutor: "It [the argument] shows that there is a basis for the court to consider departure here, does it not?" Upon the completion of argument by both the defense and prosecution, the judge adjourned the hearing for a day to read the authorities quoted, examine the exhibits and because "I need to give this a good deal of thought." The judge then stated:

I think this is a very significant issue. I had, from a review of the reports, some deep concern about this individual, because he has no significant criminal record of any kind. Apparently he is basically a Grateful Dead groupie, and that is, in my experience, a cult involving extensive leadership from other people.

I'm very concerned, because I happen to believe, from considerable experience, that incarceration doesn't help anybody rehabilitate themselves; and the best experts in the field of penology support me in that view. And if this young man has got some kind of severe mental deficit, I can't imagine that any great purpose is going to be served by incarcerateing [sic] him, especially in face of the fact that there appear to be alternative treatment programs that responsible professionals believe could be of benefit to him. So it's a very important issue in the sentencing problem.

The next day the judge said:

I've read the government's cases overnight. I've read the guideline. The guideline says that I may depart downward under 5K2.13. It says a lower sentence may be warranted. And then it says something very important, I think:

"To reflect the extent to which reduced mental capacity contributed to the commission of the offense."

That's a very distinct and discrete limitation on the ability to depart. I am tied to an objective determination of the extent to which any reduced mental capacity was a causative element in bringing about the commission of the offense.

Now, I've reviewed the materials and the evidence and all the reports, and it's clear to me that these reports do not, by

a preponderance, establish that the—whatever his mental condition may be, whether it's retardation or otherwise—played a causative role in bringing about that offense. And for that factual matter, I'm satisfied that I cannot apply this guideline to depart.

Further, even if I could, I couldn't depart on the basis of getting to a position of doing what everybody wants to be done, and which probably would be, in a different system, an appropriate thing to do, which would be to put him on probation and let him work with Mr. Tanner. Because it's very clear that his reduced mental capacity, if it had any causative role, was not the sole causative role in bringing about this offense. So I couldn't absolve him fully from the guideline range.

But my conclusion is that, on the record made here, no departure is possible because the evidence simply doesn't support a causative role with respect to his mental condition.

In replying to further argument by defense counsel, the judge concluded his comments as follows:

But if you go to your own evidence, Defendant's Exhibit 1, Dr. Wood says, in his report:

"Mental condition at the time of the offense: The defendant did not present to me any indications that there was any state of mind, mental condition or unusual circumstances at the time of the offense which might indicate that the defendant had any particular mental problems at the time."

And, as Mr. Chapman [the prosecutor] pointed out, he found that he was competent to stand trial. There's no mental disease or defect affecting criminal responsibility; and that he was capable of telling the difference between right and wrong.

Now, there's just no way that, in good conscience, in good faith, I can make a finding that a condition of mental retardation, if there is one, played a causative role in bringing about the offense.

Now, I'm not happy about this particular result. I think that, left to my own devices, there would be a better way to handle the case. But the guidelines cover the case, and they provide for a guideline range about which there isn't a great deal of dispute, or any dispute, of 63 to 78 months. And I just can't see how there's any basis or any predicate for me to depart.

We conclude that the comments of the district judge read as a whole can only mean that he knew that he could depart downwards under § 5K2.13 but decided that he should not do so because the defendant's reduced mental capacity did not contribute to the commission of the offense. We do not think that the judge's observations about the fairness of the sentence and preference for probation indicate, as defendant urges, that the judge did not understand that he had the right to depart downward. The comments depict a conscientious jurist faced with a difficult sentencing issue who considered the facts of the offense and the mental condition of the defendant against the demands of the explicit language of § 5K2.13. After a great deal of soul-searching the judge decided that there was no principled basis for a downward departure. We agree and applaud the thoughtful consideration given the matter by the district judge.

■ Defendant, in an alternative argument, presses for reversal on the basis that the facts show that his diminished mental capacity did play a causative role in the offense. Under the statute we are bound to "accept the findings of fact of the district court unless they are clearly erroneous and . . . give due deference to the district court's application of the guidelines to the facts." 18 U.S.C. § 3742(e); *see United States v. Diaz–Villafane,* 874 F.2d at 49. Under this standard the district court must be upheld. We add that we have found no evidence in either the presentence report or the transcript of the sentencing hearing that defendant's mental condition played any role in the offenses charged. There is nothing to indicate that he was led or persuaded by his peers into selling LSD.

The sales were made to DEA agents and confidential informants, who approached defendant directly. Defendant was not a runner or courier carrying out the bidding of someone with a stronger intelligence. The PSI states that "there were no real principals among the group relating to the sale of illegal drugs." Defendant's mental condition may have led him to become one of the camp followers of the Grateful Dead, but it did not contribute to the offenses charged.

Defendant also claims that the sentencing judge should have departed under U.S.S.G. § 5K2.13 because he will be victimized in prison due to his diminished mental capacity. That section, however, allows departures "to reflect the extent to which reduced mental capacity contributed to the commission of the offense." *Id.* It does not make diminished mental capacity an independent ground for departure.

Defendant also invokes policy statement § 5K2.0 as the basis for a downward departure. A district court may depart from the guidelines if it "finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." 18 U.S.C. § 3553(b); *see also* U.S.S.G. § 5K2.0, p.s. "Departure is permitted in those cases where idiosyncratic circumstances warrant individualization of sentence beyond that which is possible within the comparatively close-hewn parameters constructed by the guidelines." *Aguilar–Pena,* 887 F.2d at 349. Departures, however, are meant to be the exception, not the rule. *Id.* at 349–50 (citing *Diaz–Villafane,* 874 F.2d at 52). "[T]here must be something 'special' about a given offender ... which distinguishes the case from the mine-run for that offense." *Aguilar–Pena,* 887 F.2d at 350.

The Sentencing Commission considered mental conditions and determined that they "are not ordinarily relevant in determining whether a sentence should be outside the guidelines...." U.S.S.G. § 5H1.3, p.s. We have consistently held that factors considered by the Sentencing Commission will not be grounds for departure from the guidelines, except in extraordinary circumstances. In the following cases we found there were no extraordinary circumstances justifying departure. *United States v. Sklar,* 920 F.2d 107, 116–17 (1st Cir.1990) (post-arrest rehabilitation); *United States v. Deane,* 914 F.2d 11, 14 and n. 2 (1st Cir.1990) (family ties); *United States v. Studley,* 907 F.2d 254, 258 (1st Cir.1990) (mental or emotional condition); *United States v. Pozzy,* 902 F.2d 133, 138–40 (1st Cir.) (pregnancy, marital relationship), *cert. denied,* — U.S. —, 111 S.Ct. 353, 112 L.Ed.2d 316 (1990); *United States v. Williams,* 891 F.2d 962, 965–66 (1st Cir. 1989) (desire to reform; addiction; "ineffectiveness" as bank robber).

We do not think that a person with borderline intelligence or mild retardation who is easily persuaded to follow others presents "mitigating circumstances of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines." 18 U.S.C. § 3553(b); U.S.S.G. § 5K2.0, p.s. Borderline intelligence is not so extraordinary as to overcome the clear mandate of policy statement § 5H1.3 that mental conditions "are not ordinarily relevant in determining whether a sentence should be outside the guidelines...."

Finally, defendant claims that the application of the sentencing guidelines in this case violated his constitutional rights to due process and equal protection and constituted cruel and unusual punishment. The defendant did not raise these claims before the trial court and is therefore foreclosed from raising them here. *United States v. Morales–Diaz,* 925 F.2d 535, 539 (1st Cir.1991) (issues not raised below subject to the plain error standard); *United States v. Twomey,* 806 F.2d 1136, 1141 n. 5 (1st Cir.1986) ("Issues not raised before the trial court will be considered on appeal only if to foreclose them would abet a gross miscarriage of justice."). We add that there is little, if any, merit to the constitutional claims.

334

The sentence of Michael Neal Lauzon is affirmed.