UNITED STATES COURT OF APPEALS
 FOR THE FIRST CIRCUIT
 
No. 91-2034
 UNITED STATES OF AMERICA,

 Appellee,

 v.

 JOSE HERNANDEZ,

 Defendant, Appellant.

 
No. 91-2035
 UNITED STATES OF AMERICA,

 Appellee,

 v.

 AGUILINO JOSE SANCHEZ,

 Defendant, Appellant.

 
No. 91-2036
 UNITED STATES OF AMERICA,

 Appellee,

 v.

 JORGE L. SOSTRE,

 Defendant, Appellant.

 

 APPEALS FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF RHODE ISLAND

 [Hon. Francis J. Boyle, U.S. District Judge]
 

 

 Before

 Torruella, Circuit Judge,
 

 Coffin, Senior Circuit Judge,
 

 and Cyr, Circuit Judge.
 

 

 Robert R. Anderson for appellant Hernandez.
 
 Ernest Barone for appellant Sanchez.
 
 Joel D. Landry for appellant Sostre.
 
 Margaret E. Curran, Assistant United States Attorney, with whom
 
Lincoln C. Almond, United States Attorney, James H. Leavey, Assistant
 
United States Attorney, and Kenneth P. Madden, Assistant United States
 
Attorney, were on brief for appellee.

 

 May 12, 1993
 

 CYR, Circuit Judge. Following trial, defendants Jose
 CYR, Circuit Judge.
 

Hernandez, Aguilino Jose Sanchez, and Jorge Luis Sostre (herein-

after, collectively: "appellants") were convicted and sentenced

on various charges arising out of an undercover cocaine transac-

tion in Providence, Rhode Island. Finding no error, we affirm.

 I

 BACKGROUND
 

 In February 1991, Rodrigo Sostre ("Rodrigo"), through

an intermediary, offered to sell a kilogram of cocaine to Frdy

Vegas, a paid DEA informant. While consulting with his usual

cocaine source, one Luis Guillermo Santiago-Martinez, Rodrigo

repeatedly spoke by telephone with Vegas between February 15 and

February 19, finally arranging for the drug transaction to take

place at Rodrigo's apartment on the afternoon of February 19. 

 At 2:00 p.m. on February 19, Rodrigo and his brother

Jorge Luis Sostre ("Jorge") met Vegas and an undercover DEA

agent, Anthony Roberto, on the front porch of Rodrigo's apartment

building. Agent Roberto asked Rodrigo if "everything [was]

ready," and Rodrigo responded that "the people were on their

way." Rodrigo went upstairs to his second floor apartment to

phone his "source." When he returned to the porch, Rodrigo

stated that the cocaine was of good quality, and that his neigh-

borhood was a much safer place for a drug transaction because

 3

there was "less police activity." Jorge agreed with his brot-

her's assessment.

 At 2:15 the cocaine had not yet arrived, and Rodrigo

returned to his apartment to make another phone call. Jorge, who

remained on the front porch with Vegas and Agent Roberto, stated:

"I don't blame you guys to leave [sic], you've got a lot of money

and that's a lot of merchandise to be waiting around for."

Rodrigo returned, informing Vegas and Agent Roberto: "they [are]

on their way." After a third unsuccessful phone call by Rodrigo,

Vegas told the Sostre brothers that he would wait at a nearby

store until notified by beeper that the cocaine had arrived.

 In the meantime, DEA agents observed appellants Sanchez

and Hernandez as they arrived by car at the residence of Santia-

go-Martinez, Rodrigo's usual drug supplier. Santiago-Martinez

entered the back seat of the car, which then proceeded to Ro-

drigo's apartment, arriving at approximately 2:54. At approxi-

mately the same time, Vegas's beeper was activated, and he

returned with Agent Roberto to Rodrigo's apartment house, where

the Sostre brothers met them on the front porch. Rodrigo brought

them upstairs, while Jorge remained on the porch. Once inside

the upstairs apartment, Rodrigo locked the door. Sanchez,

Santiago-Martinez, and Hernandez were inside the apartment as

well, standing around a table upon which lay a one-kilogram

package of cocaine which later tested 94% pure. Agent Roberto

inquired in Spanish: "Why do you need three people?" Sanchez

responded in Spanish: "That's the way I do business." After

 4

inspecting the cocaine, Agent Roberto went out to his car,

ostensibly to get the $28,000 purchase money, and signalled for

the waiting DEA agents to raid the apartment. Just after the

raid commenced, DEA agents saw Jorge walk off the front porch "in

a rapid manner," then "start casually slowing down and walking up

the sidewalk." Jorge was arrested, as were Rodrigo, Santiago-

Martinez, Sanchez, and Hernandez. Hernandez had a loaded semi-

automatic in his possession at the time of his arrest. The five-

count indictment followed, and Hernandez, Sanchez, and Jorge

Sostre were convicted on all charges.1

 II

 DISCUSSION
 

A. Hernandez' Appeal.
 

 Hernandez challenges the district court's refusal to

instruct the jury that he could not be convicted on Count 3

(using or carrying a firearm during and in relation to a drug

 

 1The original indictment charged appellants, along with
Santiago-Martinez and Rodrigo Sostre, in two counts: Count 1
(conspiracy to distribute and to possess with intent to dis-
tribute, 21 U.S.C. 846) and Count 2 (possession of cocaine with
intent to distribute, id. 841(a)(1), (b)(1)(B); 18 U.S.C. 
 
2). Only Sanchez and Jorge appeal their convictions on counts 1
and 2.
 The indictment charged Hernandez and Sanchez in two counts:
Count 3 (using or carrying a firearm during and in relation to a
drug trafficking offense, 18 U.S.C. 924(c)(1); id. 2), and
 
Count 4 (possession of a firearm by an illegal alien, id. 922-
 
(g)(5); id. 2). After trial, Sanchez won a judgment of acquit-
 
tal on Count 3. Hernandez appeals his conviction under Count 3.
 The government dismissed Count 4 prior to trial. Finally,
Sanchez appeals his conviction under Count 5 (possession of a
firearm by a convicted felon, id. 922(g)(1); id. 2).
 

 5

trafficking offense, 18 U.S.C. 924(c)(1)) for "mere possession"

of a firearm, but that the government was required to prove that

the firearm was an "integral part" of the offense, or that his

possession of it was made known to others present during the drug
 

transaction.2 These arguments are without merit.

 The challenged instruction recited the corresponding

principles that a conviction under section 924(c) would not be

warranted for "mere possession," and that the jury must find that

the firearm "facilitated" the crime.3 As the district court

suggested, the "facilitation" element of section 924(c) would

depend on whether Hernandez' intent was reasonably inferable from

the totality of the circumstances, which is "a matter for a

[trier of fact] applying common sense theories of human nature

and causation." United States v. Plummer, 964 F.2d 1251, 1255
 

 

 2Hernandez' proposed instruction provided, in its entirety:
"Possession of a firearm constitutes use in relation to drug
trafficking offense if possession is [sic] integral part of, and
facilitates commission of, drug trafficking offense."

 3The jury was instructed that:

 The term "used or carried a firearm" includes the act
 of carrying, wearing, or using a firearm. The firearm
 must be within the Defendant's reach at the time of the
 offense. Mere possession of a firearm is not sufficient
 proof. The government must prove the firearm facilitat-
 ed the drug-trafficking crime. To facilitate is a [sic]
 crime does not require actual use of a firearm. Howev-
 er, a Defendant may not be convicted of this offense
 unless the jury finds beyond a reasonable doubt from
 the circumstances, the Defendant intended to use the
 
 firearm if a contingency arose potentially requiring
 its use or that the Defendant intended to use it to
 possibly facilitate escape should the need arise.

(Emphasis added.)

 6

(1st Cir.) (quoting United States v. Wilkinson, 926 F.2d 22, 26
 

(1st Cir.1991)), cert. denied, 113 S. Ct. 350 (1992). Given the
 

$28,000 in cash being exchanged for the kilogram of cocaine, as

well as Hernandez' proximity to the cocaine during the exchange

and the fact that there was a bullet in the chamber of the gun,

the challenged instruction provided adequate guidance on "facili-

tation."

 As to Hernandez' second contention, it is simply not a

correct statement of the law that the presence of a firearm used

to "facilitate" a drug trafficking offense need be made known to

other participants in the transaction. See United States v.
 

Abreu, 952 F.2d 1458, 1466 (1st Cir.), cert. denied, 112 S. Ct
 

1695 (1992); United States v. Hadfield, 919 F.2d 987, 997 (1st
 

Cir. 1990), cert. denied, 111 S. Ct. 2036 (1991); see also United
 

States v. Jones, 965 F.2d 1507, 1514-15 (8th Cir.), cert. denied,
 

113 S. Ct. 346 (1992); United States v. Contreras, 950 F.2d 232,
 

241 (5th Cir. 1991), cert. denied, 112 S. Ct. 2276 (1992); United
 

States v. Torres-Medina, 935 F.2d 1047, 1049 (9th Cir. 1991);
 

United States v. Paz, 927 F.2d 176, 179 (4th Cir. 1991); United
 

States v. Torres, 901 F.2d 205, 217 (2d Cir. 1990); United States
 

v. McKinnell, 888 F.2d 669, 674-75 (10th Cir. 1989); United
 

States v. Acosta-Cazares, 878 F.2d 945, 951 (6th Cir.), cert.
 

denied, 493 U.S. 899 (1989). The challenged instruction provided
 

the jury with an accurate statement of the law.

B. Sanchez' Appeal.
 

 7

 Sanchez advances four claims on appeal, which we

consider in turn.

 8

 1. Sufficiency of Evidence of Conspiracy and Possession.
 

 Sanchez contends that the government did not introduce

enough evidence to support his conviction under Count 1 (conspir-

acy to distribute and to possess with intent to distribute, 21

U.S.C. 846) and Count 2 (possession of cocaine with intent to

distribute, id. 841(a)(1), (b)(1)(B); 18 U.S.C. 2), but that
 

the evidence instead proved "mere presence" at the site of the

crime, and that he was therefore entitled to judgments of acquit-

tal. On review of a district court ruling under Fed. R. Crim. P.

29, we evaluate the evidence, draw all reasonable inferences, and

resolve all credibility determinations in the light most favor-

able to the government. United States v. Yefsky, No. 90-1174,
 

slip op. at 6 (1st Cir. May , 1992); United States v. Wight,
 

968 F.2d 1393, 1395 (1st Cir. 1992).

 Our review satisfies us that the jury supportably could

have found, beyond a reasonable doubt, that Sanchez was the

individual who transported the cocaine to Rodrigo's apartment on

February 19, 1991. Vegas and Agent Roberto had asked to be

summoned by beeper as soon as the cocaine arrived. They were

summoned at approximately the same time Sanchez arrived at the

apartment, giving rise to a reasonable inference that Sanchez was

the "source," or that a person "in charge" of the transaction had

finally arrived.4 Moreover, inside the apartment, it was San-

 

 4The record provides no direct support for the government's
contention that the beeper was activated at precisely 2:55 p.m.,
i.e., one minute following Sanchez' and Hernandez' arrival at the
 
crime scene. We note, however, that Agent Roberto merely testi-
fied that the beeper signal came at "approximately 2:50," and
 

 9

chez who advised Agent Roberto: "That's the way I do business."

In the circumstances revealed by the evidence, this admission

would support a jury determination that Sanchez not only partici-

pated in the transaction but was in charge of supplying the

cocaine to Rodrigo for sale to Roberto.5

 In an effort to negate the latter evidence, Sanchez

contends that, without his alleged incriminatory statement to

Agent Roberto, the government would not have had sufficient

evidence to convict. Citing two allegedly erroneous evidentiary

rulings, Sanchez argues that the district court improperly

restricted his defense, by which he sought to establish that

Agent Roberto was less than fluent in Spanish and may have

mistranslated Sanchez' Spanish statement into English during

direct examination at trial.6

 

Vegas and Roberto, who were waiting at a nearby store, returned
to Rodrigo's apartment at 2:58.

 5Sanchez argues that Santiago-Martinez testified that
Sanchez did not make this comment to Agent Roberto. To the
extent this alleged conflict in testimony necessitated a credi-
bility determination, we must presume the jury found Roberto more
credible. Furthermore, Santiago-Martinez' testimony could be
understood as indicating his lack of recollection ("I wasn't
paying attention"), rather than as stating that no such comment
was made.

 6Roberto, a DEA agent since the early 1980s, testified that
he had taken a four-month Spanish course in 1984, was stationed
in Monterey, Mexico from 1984 through 1986, attended an advanced
Spanish course in 1986, and used his Spanish language experience
daily as a DEA agent. Sanchez does not appear to challenge the
original admission of Roberto's interpretive testimony, to which
defense counsel raised no objection at trial. Accordingly, we
deem the issue waived. He merely argues that he should have been
allowed more opportunity to impeach Roberto on cross-examination
and on rebuttal.

 10

 The trial court has broad discretion over the scope and

extent of cross-examination. United States v. Figueroa, 976 F.2d
 

1446, 1457 (1st Cir. 1992); United States v. Berrio-Londono, 946
 

F.2d 158, 160 (1st Cir. 1991), cert. denied, 112 S. Ct. 1223
 

(1992). Sanchez contends that the district court cut short his

cross-examination of Agent Roberto concerning his proficiency

with the Spanish language. We do not agree. Out of the hearing

of the jury, the district court merely questioned the relevancy

of defense counsel's line of questioning, which had become mired

in minute detail concerning the identity of Agent Roberto's

neighbors while he was residing in Monterey during 1986. At no

time did the court prohibit defense counsel from continuing the

line of questioning, nor does the record reflect any objection to

the district court's statements. In fact, when the jury was

returned to the courtroom, defense counsel posed a follow-up

question along the same line. There was no error.

 Sanchez also claims that his Sixth Amendment right to

confrontation was violated by the court's refusal to allow him to

call the person who was serving as the court-appointed interpret-

er during Agent Roberto's direct examination.7 Sanchez argues

 
 7The court explained its ruling as follows:

 I was advised yesterday afternoon that the Interpreter
 whom we had here yesterday afternoon had been told to
 appear here today to testify. I advised, I sent work
 [sic] to him that he was not to come here today. I
 
 can't for the life of me understand why he would be
 
 asked to testify in the first place. In the second
 
 place, I'm not going to permit someone to come into
 this courtroom, and in front of the jury interpret
 testimony and then put that same person on the witness
 stand to give opinion testimony as to one's control of

 11

that the interpreter could have testified that Roberto's transla-

tion of Sanchez' incriminatory statement was unreliable, or that

Sanchez' statement was susceptible to a less incriminating

English rendition. However, defense counsel neither objected to

the district court's exclusionary ruling nor made an offer of

proof pursuant to Fed. R. Evid. 103(d), notwithstanding the

court's express statement that it could not understand "why the

[interpreter] would be asked to testify in the first place." See
 

supra note 7. Accordingly, we review for "plain error" affecting
 

the "fundamental fairness" of the trial. United States v.
 

Tracy, Nos. 92-1459, 92-1461, 92-1554, 1993 U.S. App. LEXIS 6245,
 

at 12 (1st Cir. Mar. 29, 1993); United States v. McGill, 952 F.2d
 

16, 18 (1st Cir. 1991).

 Sanchez argues that the interpreter's testimony was the

only practicable way to convey to a non-Spanish-speaking jury the

untrustworthiness of Agent Roberto's testimony. Even discounting

defense counsel's unexplained failure to come forward with either

an objection or the "invited" offer of proof, cf. Hernandez-Garza
 

v. INS, 882 F.2d 945, 948 (5th Cir. 1989) (immigration judge
 

erred by refusing to allow party to test INS agent's fluency in

Spanish, and by dismissing party's observation "that a qualified

 

 the Spanish language. That's vouching in the highest
 order. Anything else?

(Emphasis added.)

 12

interpreter was present"),8 Sanchez does not explain why it was

necessary that the court-appointed interpreter testify, particu-

larly in light of the district court's plainly stated concern

that the interpreter might be placed in the position of appearing

to vouch for or against a translation previously rendered in his

role as court-appointed interpreter. Agent Roberto's proficiency

in Spanish could as well have been tested on cross-examination9

or through an interpreter selected by the defense, as indeed

could other possible translations of Sanchez' incriminating

remark. Therefore, even if defense counsel believed the district

court was adamantly opposed to calling the court-appointed inter-

preter, there was no apparent reason for neither explaining the

defense's position nor requesting a continuance to obtain an

interpreter. Finally, since Sanchez has never suggested another

English translation of the incriminating statement, there has

been no showing of plain error.

 2. Evidence of Constructive

 

 8At oral argument, Sanchez' counsel explained that not all
objections can be made in "the heat of trial." Yet it is pre-
cisely in the "heat of trial" that counsel's timely articulation
of grounds for proposing or opposing the admission of evidence is
most important to the trial court. Similarly, "[i]f lawyers
could pursue on appeal issues not properly raised below, there
would be little incentive to get it right the first time and no
end of retrials." Poliquin v. Garden Way, Inc., F.2d ,
 
 (1st Cir. 1993) [Nos. 92-1115, 92-1116, slip op. at 8 (1st
Cir. Mar. 24, 1993)].

 9Indeed, during his extended cross-examination of Agent
Roberto, Sanchez' counsel was allowed great latitude, and engaged
Roberto in a prolonged exercise in which he asked Roberto to give
Spanish-English and English-Spanish translations for a series of
common expressions.

 13

 Possession of Firearm. 
 Possession of Firearm.
 

 Sanchez argues that he could not be convicted on Count

5 (transportation of a firearm by a convicted felon, 18 U.S.C. 

922(g)(1)) for "constructive possession" of Hernandez' firearm

because the government introduced no direct evidence that Sanchez
 

knew that Hernandez was carrying it. Sanchez' argument depends
 

primarily on his unsuccessful attempt to undermine Agent Rob-

erto's testimony concerning the incriminating statement Sanchez

made on February 19, 1991. The government points out that since

Sanchez proclaimed that he was in charge of the drug deal, he

could be found to have "controlled" Hernandez. A reasonable

inference could then be drawn that Hernandez was there at San-

chez' behest to protect the drugs, and Sanchez. "[A]s long as a

convicted felon knowingly has the power and the intention at a

given time of exercising dominion and control over a firearm,

. . . directly or through others, he is in [constructive] posses-
 

sion of the firearm." United States v. Wight, 968 F.2d 1393,
 

1398 (1st Cir. 1992) (emphasis added); see also United States v.
 

McAnderson, 914 F.2d 934, 947-48 (7th Cir. 1990). The evidence
 

was sufficient to establish Sanchez' constructive possession of

the firearm carried by Hernandez. 

 3. Entrapment Defense. 
 3. Entrapment Defense
 

 Sanchez contends that he was entitled to an entrapment

instruction. Since there was no post-charge objection to the

refusal to give an entrapment instruction, however, we review for

plain error. See United States v. Arias-Santana, 964 F.2d 1262,
 

 14

1268 (1st Cir. 1992) (citing Fed. R. Crim. P. 52(b), which

mandates renewed objection after court's charge and before jury

retires to deliberate).

 The entrapment defense consists of two components: (1)

government inducement of the crime, and (2) an absence of predis-

position on the part of the defendant to commit the alleged

crime. United States v. Reed, 977 F.2d 14, 18 (1st Cir. 1992);
 

United States v. Tejeda, 974 F.2d 210, 217 (1st Cir. 1992).
 

Sanchez contends that the district court improperly required him

to produce evidence of lack of predisposition, whereas the burden

of production should have shifted to the government to prove

predisposition once Sanchez established government inducement.

The argument is irreparably flawed in at least two respects.

 First, Sanchez was entitled to an entrapment instruc-

tion only if he first produced "some evidence" on both ele-
 

ments of the entrapment defense sufficient to raise a reason-

able doubt as to whether he "was an 'unwary innocent' rather than

an 'unwary criminal.'" Id. (quoting Mathews v. United States,
 

485 U.S. 58, 63 (1988)). Second, Sanchez produced no evidence of

government inducement. Before he arrived at the scene of the

drug transaction on February 19, 1991, Sanchez had no direct

contact with any government agent. "[T]his court [has] refused

to extend the entrapment defense to a defendant in contact only
 

with an intermediary, and not the government agent, absent 'a
 

showing that pressure had been put upon him by the intermediary

at the instruction of the government agent.'" United States v.
 

 15

Murphy, 852 F.2d 1, 6 (1st Cir. 1988) (quoting United States v.
 

Bradley, 820 F.2d 3, 8 (1st Cir. 1987)) (emphasis added), cert.
 

denied, 489 U.S. 1022 (1989); see also United States v. McKenna,
 

889 F.2d 1168, 1174 (1st Cir. 1989). Sanchez does not suggest,

nor does the record disclose any evidence, that government agents

even knew about Sanchez or his involvement in the offense prior

to his arrival at the scene of the undercover drug buy, let alone

that agents instructed anyone to pressure Sanchez to take part.

Absent any evidence of government inducement, Sanchez was not

entitled to a jury charge on entrapment, and the court committed

no error, plain or otherwise.

 4. Refusal to Depart. 
 4. Refusal to Depart
 

 Finally, citing 18 U.S.C. 3553 ("The court shall

impose a sentence sufficient, but not greater than necessary
 

. . . .") (emphasis added), Sanchez says the district court erred

in refusing to depart below the "excessive" thirty-year guideline

sentence to reflect Sanchez' "minimal" role in the offense. Even

accepting Sanchez' characterization of his role in the offense,

the refusal to depart is not reviewable unless the district court

mistakenly believed it lacked the authority to depart. United
 

States v. Amparo, 961 F.2d 288, 292 (1st Cir.), cert. denied, 113
 

S. Ct. 224 (1992); United States v. Lauzon, 938 F.2d 326, 330
 

(1st Cir.), cert. denied, 112 S. Ct 450 (1991). As the district
 

court was fully cognizant of its authority, we are without

jurisdiction to consider Sanchez' guideline sentencing appeal.

 16

C. Jorge's Appeal. 
 

 Jorge Sostre claims that his convictions under Count 1 

(conspiracy to distribute and to possess with intent to distrib-

ute, 21 U.S.C. 846) and Count 2 (possession of cocaine with

intent to distribute, id. 841(a)(1), (b)(1)(B); 18 U.S.C. 2)
 

were based solely on his "mere presence" in the vicinity of the

drug transaction. Jorge contends that he was simply visiting

brother Rodrigo's apartment, and that the casual statements he

made to Vegas and Agent Roberto, though arguably indicating his

general awareness of the drug transaction, were far too vague to

establish his active participation. Jorge says the government's

characterization of him as a "lookout" is unsupported by the

evidence, which shows that the front door of the apartment

building was left open during the drug transaction, and that he

never made any attempt to signal or warn the others when the DEA

raid began. As to his constructive possession of the cocaine,

Jorge argues that there is no evidence he ever had access to it

or power over it.

 We again view all evidence in the light most favorable

to the government, Wight, 968 F.2d at 1395, while at the same
 

time recognizing that "'the line that separates mere presence [at

the site of a drug offense] from culpable presence is a thin one,

difficult to plot,'" United States v. O'Campo, 973 F.2d 1015,
 

1020 (1st Cir. 1992) (quoting United States v. Ortiz, 966 F.2d
 

707 (1st Cir. 1992)). In this case, however, we believe that the

evidence, as a whole, adequately supported the conclusion that

 17

Jorge knowingly remained on the front porch to facilitate the

prearranged drug transaction.

 First, Jorge's presence during Rodrigo's incriminating

conversations with Vegas and Agent Roberto, his apparent agree-

ment with his brother's assessments concerning the quality of the

cocaine and the low level of police activity in the neighborhood,

and his later statements about the "money" and "merchandise,"

provided firm support for an inference that Jorge knew that an

illegal drug transaction was about to occur.

 Second, "jurors are neither required to divorce them-

selves from their common sense nor to abandon the dictates of

mature experience," which reasonably may include their recogni-

tion that "criminals rarely welcome innocent persons as witnesses

to serious crimes." Cf. Ortiz, 966 F.2d at 712; United States v.
 

Batista-Polanco, 927 F.2d 14, 18 (1st Cir. 1991). Jorge did not
 

reside at the apartment where the drug transaction occurred, nor

was he a captive of the circumstances. Although appellate

counsel suggested the possibility that Jorge's visit to his

brother's apartment may have been occasioned by the innocent

impulse to promote their filial bond, the jury reasonably could

conclude that an innocent person, with knowledge of an impending

drug transaction, would not linger outside for over an hour on a

winter day in a location which afforded him an obvious vantage

point from which to observe the surrounding neighborhood as well

as the ingress to the site of the drug deal. Cf. United States
 

v. Padilla, 961 F.2d 322, 325 (2d Cir.) (while "mere negative
 

 18

acquiescence," even coupled with "guilty knowledge," is generally

insufficient to establish participation, the otherwise innocent

behavior of "scanning the area" may support a reasonable infer-

ence that defendant acted as "lookout"), cert. denied, 113 S. Ct.
 

138 (1992); see also United States v. Martinez, 479 F.2d 824,
 

829 (1st Cir. 1973). ("[P]resence itself implies participation

[where] . . . a companion stands by during a [crime], ready to

sound a warning or give other aid if required.").

 Finally, the record indicates that Jorge, at the onset

of the DEA raid, moved off the front porch and away from the

residence "in a rapid manner," then "casually slow[ed] down and

walk[ed] up the sidewalk." We have recognized that "[e]vidence

of flight . . . is a particularly eloquent reflection of a guilty

mind," United States v. Martinez, 922 F.2d 914, 923 (1st Cir.
 

1991), which "'may be admitted at trial . . . so long as there is

an adequate factual predicate creating an inference of guilt of
 

the crime charged.'" United States v. Montoya, 917 F.2d 680, 683
 

(1st Cir. 1990) (quoting United States v. Hernandez-Bermudez, 857
 

F.2d 50, 52 (1st Cir. 1983)) (emphasis added). While the evi-

dence of flight would not have been enough in and of itself to

support Jorge Sostre's convictions, the jury fairly could have

found, beyond a reasonable doubt, that in so acting he was

attempting to flee the crime scene, thereby recasting his earlier

admissions and conduct as the factual predicate for the ultimate

common-sense inference of guilt. Id. (significance of evidence
 

of flight is exclusively for the jury).

 19

 The judgments of conviction are affirmed.
 

 20