**UNITED STATES, Appellee,**

v.

**Richard Clark JOHNSON, Defendant, Appellant.**

**UNITED STATES, Appellee,**

v.

**Martin QUIGLEY, Defendant, Appellant.**

**UNITED STATES, Appellee,**

v.

**Christina Leigh REID, Defendant, Appellant.**

Nos. 90–2010—90–2012.

United States Court of Appeals, First Circuit.

Heard Sept. 12, 1991.

Decided Dec. 19, 1991.

Rehearing Denied Jan. 29, 1992.

Richard E. Bachman, by appointment of the court, with whom Peter D. King and Hale, Sanderson, Byrnes & Morton, Boston, Mass., were on brief, for defendant, appellant Martin Quigley.

Alan M. Dershowitz, Cambridge, Mass. with whom Jack Zaremski, Kevin J. O'Dea, and Rosanna Cavallaro, Boston, Mass., were on brief, for defendant, appellant Richard Clark Johnson.

William P. Homans, Jr. with whom Homans, Hamilton & Dahmen, Boston, Mass., was on brief, for defendant, appellant Christina Leigh Reid.

Alexandra Leake, Asst. U.S. Atty., with whom Wayne A. Budd, U.S. Atty., Ronald R. Roos, Trial Atty., and Christine M. Thren, Atty. Advisor, were on brief, for appellee.

Before TORRUELLA, Circuit Judge, COFFIN and TIMBERS,* Senior Circuit Judges.

COFFIN, Senior Circuit Judge.

Appellants were convicted of conspiracy and substantive offenses for their roles in terrorist activities directed against the British presence in Northern Ireland. They seek to overturn their convictions and vacate their sentences on various grounds. After careful review of the record in this case, we affirm the judgments of the district court and uphold the convictions and sentences of all three appellants.[1]

### I. Background

The facts as the jury could have found them are as follows. From 1978 until his arrest in July 1989, appellant Richard Clark Johnson, an American citizen, was engaged in the research and development of explosives for export to the Republic of Ireland and use by the Provisional Irish Republican Army (the PIRA) in its attacks against British civilian and military targets there

---

* Of the Second Circuit, sitting by designation.

1. Arrest warrants for two others, Peter Eamon Maguire and Gerald Vincent Hoy, were issued along with those for appellants. Maguire is an Irish national who is not present in the United States, has not been arrested, and was not present at trial. Hoy pled guilty to the charges against him on May 29, 1990. Neither is a party to this appeal.

and elsewhere. Johnson is a highly educated and trained electrical engineer. Since receiving his Master's Degree in the early 1970's he has worked for a number of prominent firms in the aerospace industry, including Hughes Aircraft and the Northrop Corporation in California. From 1986 on Johnson carried out his weapons research and development in a workshop built by him in the basement of his parents' home in Harwich, Massachusetts.

Between 1981 and 1986, Johnson wrote and sent a series of letters regarding the procurement and development of remote-control bombs to Peter Eamon Maguire, an electronic systems expert in the Republic of Ireland who is named a defendant in this case, *see supra* note 1. The letters ("the Clondalkin letters") describe Johnson's efforts to perfect the technology of the remote-control bombs that have been used by the PIRA in its attacks upon persons and property in Northern Ireland and elsewhere since 1972.[2] In 1987 the Irish national police seized these letters from a hiding place in Maguire's home in Clondalkin, Dublin.

Appellant Martin Peter Quigley is a citizen of the Republic of Ireland and a United States resident. Like Johnson, he has been involved in ongoing efforts to improve the technology of PIRA weaponry. In December 1988, in a conversation over a pay telephone, Quigley solicited Johnson's advice regarding the development of a surface-to-air missile system to "counteract" British military helicopters in Northern Ireland. Between 1988 and 1989, Quigley regularly encouraged appellant Christina Leigh Reid to join an amateur rocketry society and familiarize herself with the construction and operation of rocket motors for use in the anti-helicopter missile system. In the summer of 1989, Quigley participated in the acquisition of a .50 caliber rifle for export to the Republic of Ireland.

Appellant Christina Leigh Reid, an American citizen, is a college-educated electrical engineer and was employed by a defense-related firm in California until her arrest. From 1983 on, she served as a courier of electronic components for the remote-control bombs and of information, including a request for handguns, between Johnson in the United States and "Sean," an associate of Maguire, in the Republic of Ireland. In the summer of 1983, as national security efforts increased in preparation for the Los Angeles Olympic games, Reid provided a false social security number and address to obtain a post office box, in her name, to insure the safety and secrecy of the Johnson–Maguire correspondence.

In late 1988, Reid introduced Johnson to Quigley, over the telephone, for the purpose of advancing the development of PIRA weaponry. It was during that telephone call that Quigley requested Johnson's assistance in developing the anti-helicopter missile system. Thereafter, Reid, with Quigley's encouragement, sought to join an amateur rocketry society with a view to learning about rocket motors and assisting in the deployment of the anti-helicopter missile system.

A federal grand jury returned a four count superseding indictment (the indictment) against appellants on March 22, 1990. Count One charged all three appellants with conspiracy to violate the Arms Export Control Act, 22 U.S.C. §§ 2778(b)(2), (c), in violation of 18 U.S.C. § 371, by conspiring to export devices and materials for the discharge of bombs from the United States, without first obtaining an export license. Count Two charged Johnson with

2. Johnson refers to the acquisition of 27 and 72 megahertz radio transmitters, the type of transmitter typically used by the PIRA in its remote-control bombs. The letters also chronicle Johnson's efforts to improve the detonation mechanism of the bombs through the use of laser technology, which would shield the system from jamming attempts. The FBI seized most of the components of this laser-based system from Johnson's workshop in Harwich.

The letters describe Johnson's attempts to enhance the detonator system by using the Weather Alert radio frequency. From August 1983 on, Northern Irish authorities began to recover the remains of Weather–Alert bombs in the wake of PIRA-sponsored bombings. The letters also describe Johnson's procurement of model FX–401 frequency selector switches, used by the PIRA as decoders in its remote-control bombs, and his efforts to develop a time-delayed fuse controlled by a digital wrist watch.

the actual manufacture and export of these materials, in violation of 22 U.S.C. §§ 2778(b)(2), (c). Count Three charged all three appellants with conspiracy to injure and destroy British military helicopters based at the Royal Air Force Station in Aldergrove, Northern Ireland in violation of 18 U.S.C. § 956. Count Four charged appellants Johnson and Quigley with the possession and control of property, namely Johnson's Harwich, Massachusetts laboratory, used and intended for use in the destruction of British military helicopters in aid of the PIRA, in violation of 18 U.S.C. §§ 957 and 2.

Appellants filed various motions before and during trial. We discuss those relevant to this appeal briefly. All three appellants moved for the suppression of evidence acquired through the government's electronic surveillance of Johnson and Quigley. In addition, all three moved to dismiss Count Three of the indictment for failure to describe with adequate specificity the helicopters that appellants conspired to destroy. Johnson and Quigley moved to dismiss Count Four of the indictment on the ground that the underlying statute, 18 U.S.C. § 957, violates the First and Fourteenth Amendments of the United States Constitution. Quigley moved for severance of his trial from that of the co-defendants.

The district court denied appellants' motions. Following a twenty-eight day trial, the jury found all three appellants guilty of the charges against them, and the district court sentenced appellants accordingly. On appeal, Johnson, Quigley and Reid assert numerous grounds for reversing their convictions and, in the case of Quigley and Johnson, vacating their sentences. We now turn to our discussion of these claims.

## II. *The FISA Surveillance Evidence*

■ Between August 1988 and July 1989, the time of appellants' arrests, the government conducted electronic surveillance of Johnson and Quigley pursuant to the Foreign Intelligence Surveillance Act, 50 U.S.C. §§ 1801–11 (FISA).[3] Enacted in 1978, FISA establishes a statutory procedure whereby a federal officer, acting through the Attorney General, may obtain a judicial warrant authorizing the use of electronic surveillance in the United States for foreign intelligence purposes. *See* S.Rep. No. 604, 95th Cong., 2d Sess. (1978), *reprinted in* 1978 U.S.Code Cong. & Admin.News 3904, 3906; *United States v. Duggan,* 743 F.2d 59, 77 (2d Cir.1984).

The results of the surveillance undertaken in this case include audio tapes of incriminating conversations among appellants and constitute a substantial portion of the government's evidence. The government identified for appellants the tapes that it intended to use at trial and made available to them all of the tapes in advance of trial.

Prior to trial all three appellants moved for suppression of the FISA evidence, arguing that it had been obtained in violation of FISA and the United States Constitution. The Attorney General having filed an affidavit that disclosure of the FISA applications and orders would jeopardize national security interests, the magistrate judge conducted an *ex parte in camera* review of the materials.[4] The magistrate judge concluded that the surveillance was legal in all respects and, in a lengthy and careful opinion, recommended that appellants' suppression motions be denied. The district court adopted this recommendation.

Appellants renew their suppression arguments on appeal. At the request of all parties, this court has conducted its own *ex parte, in camera* review of the surveillance applications and orders. Having done so, we agree with the magistrate

---

**3.** The government did not seek to subject Reid to electronic surveillance. Her conversations were recorded only to the extent that they were with Johnson or Quigley.

**4.** FISA § 1806(f) provides that where the Attorney General files an affidavit that disclosure or an adversary hearing on FISA related material

would harm the national security of the United States, the district court is prohibited from disclosing the contested material. Under such circumstances, the district court is to review the material *in camera* and *ex parte* to determine whether the surveillance was lawfully authorized and conducted.

judge and the district court that the FISA surveillance of appellants was lawfully authorized and conducted.

## A. Threshold Challenge

### 1. *Purpose of the FISA Surveillance*

■ Appellants attack the government's surveillance on the ground that it was undertaken not for foreign intelligence purposes, but to gather evidence for a criminal prosecution. FISA applications must contain, among other things, a certification that the purpose of the requested surveillance is the gathering of foreign intelligence information and a detailed description of the nature of the information sought. *See* §§ 1802(a)(1)(A), 1804(a)(6), (7). Although evidence obtained under FISA subsequently may be used in criminal prosecutions, *see* S.Rep. No. 701, 95th Cong., 2d Sess. (1978), *reprinted in* 1978 U.S.Code Cong. & Admin.News 3973, 3979–85 [hereinafter S.Rep. No. 95–701]; *Duggan*, 743 F.2d at 78, the investigation of criminal activity cannot be the primary purpose of the surveillance. *See Duggan*, 743 F.2d at 77; *United States v. Truong Dinh Hung*, 629 F.2d 908, 915 (4th Cir.1980). The act is not to be used as an end-run around the Fourth Amendment's prohibition of warrantless searches.

■ We find no evidence of an end-run in this case. From our review of the government's FISA applications, it is clear that their primary purpose, from the first authorization in July 1988, to July 1989, when appellants were arrested, was to obtain foreign intelligence information, not to collect evidence for any criminal prosecution of appellants. The government's inquiries were all directed to activities relating to the support of PIRA operations in Northern Ireland. At no point was there reference to any criminal liability or prosecution.

### 2. *Showing of Necessity*

In a variation on the "impermissible purpose" argument, Johnson and Reid argue that their United States citizenship and residency render the FISA surveillance of them illegal under both FISA and the Fourth Amendment. We consider the statutory challenge first.

■ Where the government seeks FISA authorization for the surveillance of a "United States person," as opposed to a foreign national or a foreign power, FISA requires that it make a specialized showing that the information sought is "necessary to ... the ability of the United States to protect against," *inter alia*, "sabotage or international terrorism by a foreign power or an agent of a foreign power; or clandestine intelligence activities by ... a foreign power or by an agent of a foreign power," §§ 1801(e)(1)(B), (C), or that the information is "necessary to ... the conduct of the foreign affairs of the United States," § 1801(e)(2)(B).

Johnson, joined by Reid, contends that because his work for the PIRA was not directed against the United States and because the government could not have shown that information regarding his PIRA activity was "necessary" to the conduct of foreign affairs or to the prevention of international terrorism, the FISA surveillance violated the statute.

The fact that appellants' terrorist activity was directed at Northern Ireland, rather than the United States, is of no consequence to the legality of the FISA surveillance, as the legislative history and plain language of FISA make clear. FISA permits surveillance of an American person where the information sought is necessary to the ability of the United States "to protect against ... international terrorism." § 1801(e)(1)(B). This class of information is manifestly broader than that comprising information necessary for the United States to protect *itself* against such dangers. As the drafters of FISA stated:

The committee intends that terrorists ... acting for foreign powers should be subject to surveillance under this bill when they are in the United States, even if the target of their violent acts is within a foreign country and therefore outside actual Federal ... jurisdiction. This departure from a strict criminal standard is justified by the international responsibili-

ty of government to prevent its territory from being used as a base for launching terrorist attacks against other countries. S.Rep. No. 95–701 at 3999, *quoted in Duggan*, 743 F.2d at 74.

■ Having reviewed the FISA applications in this case, we find that they conform to the standards governing the surveillance of American persons set forth in § 1801(e). The applications reveal that Johnson had engaged in terrorist acts in support of PIRA efforts directed against British interests in Northern Ireland. They thus demonstrate that Johnson was a member of "a group engaged in international terrorism or activities in preparation therefore," and, as such, an "agent of a foreign power." §§ 1801(a)(4), (b)(1)(A). In addition, the information sought by the government in its surveillance of Johnson was, in our estimation, necessary to the ability of the United States to protect against international terrorism and to manage its foreign affairs. *See Duggan*, 743 F.2d at 74 ("[I]nternational terrorism conducted from the United States, no matter where it is directed, may well have a substantial effect on United States national security and foreign policy."); S.Rep. No. 95–701 at 3999.

■ Johnson and Reid also maintain that the FISA provisions governing the surveillance of United States citizens contravene the Fourth Amendment's prohibition of warrantless searches. This argument was apparently not raised before the magistrate judge. Before us, it achieves its fullest expression in a footnote to Johnson's Reply Brief. We suspect, therefore, that appellants have waived this claim for purposes of their appeal. We have reviewed it, nonetheless, and find it to be without merit for the reasons set forth by the Second Circuit in *Duggan*, 743 F.2d at 72–74 (requirements of Fourth Amendment vary with governmental interest at stake; " 'procedures established in [FISA] are reasonable in relation to legitimate foreign counterintelligence requirements and the protected

rights of individuals.' " *Id.* at 73 (quoting S.Rep. No. 95–701 at 3983)).[5]

**B. The Legality of the Subsequent FISA Applications**

■ Appellants challenge the legality of the government's applications to renew the initial surveillance order of July 1988. They argue that the government's failure to include the results of the first surveillance, conducted between July and October 1988, in its applications to extend the surveillance, filed subsequently, contravened the pertinent provisions of FISA.

We disagree with appellants' construction of the relevant FISA provisions for the reasons recommended by the magistrate judge and adopted by the district court. *See* Report and Recommendation of Magistrate Judge at 8–10 (Appellants' argument precluded by FISA § 1805(d)(2), which permits FISA judge to extend surveillance authorization "on the same basis as [the] original order."). Moreover, we have reviewed the government's reauthorization applications in this case and find that each presented the court with facts establishing that appellants Johnson and Quigley were acting as agents of a foreign power, pursuant to §§ 1805(a)(3)(A), 1801(b)(2)(C), (D). Each application not only set forth the facts supporting prior applications, as required by § 1804(a)(9), but also meticulously supplied the FISA judge with new details of appellants' terrorist activity.

**III. *The Opening Statements and the Challenged PIRA Evidence***

Appellants argue that the government's opening statement and the district court's admission of certain evidence over appellants' objections denied them the right to a fair trial guaranteed by the Sixth Amendment of the Constitution.

**A. *The Government's Opening Statement***

■ Certain of the prosecution's opening remarks were, according to appellants, so improperly inflammatory as to prejudice

---

**5.** While it is true that the FISA target in *Duggan* was not a United States citizen, the court's reasoning applies with equal force to the surveillance of resident United States citizens.

irreparably their right to a fair trial. Appellants object to the government's characterization of the case as " 'an echo of sadness from the graves of dead generations' " and its references to, among other things, the "bloody but abortive" Irish Republican uprisings against British rule, the PIRA's bombing campaign of British civilian and military targets, and the acts of "ambush" and "sabotage" perpetrated by the PIRA "amongst the hedgerows, stone walls and narrow lanes of the Irish countryside." Appellants assert that the government's prejudicial comments mandate the reversal of their convictions.

This circuit recognizes the impropriety of prosecutorial commentary serving "no purpose other than 'to inflame the passions and prejudices of the jury, and to interject issues broader than the guilt or innocence of the accused,' " *United States v. Machor,* 879 F.2d 945, 956 (1st Cir.1989) (quoting *United States v. Doe,* 860 F.2d 488, 494 (1st Cir.1988)). We are, likewise, mindful of the threat to a defendant's right to a fair trial posed by remarks foisting a theory of "guilt by association" upon the jury. *United States v. St. Michael's Credit Union,* 880 F.2d 579, 602 (1st Cir.1989).

The remarks of the prosecutor are to be judged in light of the circumstances of the trial. *United States v. Socony–Vacuum Oil Co.,* 310 U.S. 150, 238–42, 60 S.Ct. 811, 851–53, 84 L.Ed. 1129 (1940); *United States v. Boldt,* 929 F.2d 35, 40 (1st Cir. 1991). The challenged statements, in our view, were not improperly inflammatory. Though vivid and rhetorical, against a background redolent of long continued violence and carnage they did not exceed the bounds of adversarial propriety. We are confident that the prosecutor's remarks had no effect on the outcome of the twenty-eight day trial. *See Boldt, id.* (prosecutorial impropriety subject to harmless error review). The government marshalled a wealth of evidence, most of it comprised of appellants' own admissions in telephone conversations and correspondence, of appellants' participation in the offenses for which they were charged and of their connections to the PIRA and its longstanding, ongoing terroristic campaign.

## B. The Challenged Evidence

Appellants also maintain that the court improperly admitted various pieces of evidence: (1) an FBI video tape of an explosion caused by a simulated PIRA remote-control bomb; (2) a newspaper article published by the PIRA's political arm recounting a failed PIRA bombing attempt; (3) an article from the same publication, seized from appellant Reid's apartment, describing the shooting down of a British military helicopter by the Irish Republican Army in Northern Ireland; (4) the testimony of a British commander forced to land his helicopter at the time of the PIRA attack recounted in the article;[6] and (5) testimony regarding the history and methods of the PIRA, including Maguire's role as one of its commanders and the development and deployment of certain weapons by the PIRA.

To be admissible, evidence must be relevant to a material fact in issue, and its probative value must outweigh any prejudicial effect upon the jury. The evidence to which appellants object was relevant to their objectives on all four counts of the indictment, which charged appellants with acting "to further the forcible reunification of ... Ireland ... by means of an armed insurrection waged by the Provisional Irish Republican Army against British and Northern Ireland authorities." The testimony concerning the methods of the PIRA and the history of the Irish conflict, in particular, was relevant, given the characterization of the PIRA as a "body of insurgents" in Count Four of the indictment.

Additionally, as the district court noted at trial, the challenged evidence was relevant to the determination of whether the various electronic components and information that appellants possessed and sought to export were, as the government

---

**6.** Reid alone challenges the admission of the newspaper article describing the attack upon British helicopters and the testimony of Lieutenant Colonel Webb, the British commander who witnessed the raid.

charged, defense materials and services or were, instead, as appellants argued, the odds and ends of innocent hobbyists.

As for the evaluation of probative value and prejudicial effect under Fed.R.Evid. 403, it is uncontroverted that the district court's "battlefield determination is to be accorded great deference on appeal," *United States v. Hadfield*, 918 F.2d 987, 995 (1st Cir.1990). " 'Only rarely—and in extraordinarily compelling circumstances— will we, from the vista of a cold appellate record, reverse a district court's on-the-spot judgment....' " *Pinkham v. Burgess*, 933 F.2d 1066, 1071 (1st Cir.1991) (quoting *Freeman v. Package Machinery Co.*, 865 F.2d 1331, 1340 (1st Cir.1988)).

The nub of appellants' unfair prejudice complaint is their contention that the challenged evidence caused the jury to convict " 'on a theory of guilt by association,' " Johnson Opening Brief at 29 (quoting *United States v. St. Michael's Credit Union*, 880 F.2d 579, 602 (1st Cir.1989)). As the district court indicated, however, there was considerable evidence, quite apart from that challenged, of appellants' involvement with the PIRA. Appellants' own conversations and correspondence, as well as the possessions recovered from their homes— the detonator designs and components and PIRA news articles—demonstrate their approval of, and contribution to, the methods and goals of the PIRA. The risk of a "guilt by association" verdict against the backdrop of direct evidence of appellants' involvement with the PIRA, is remote, at best, and insufficient to warrant a finding of unfair prejudice.

### IV. *Count Three: Specificity of Charge and Proof*

All three appellants seek to overturn their convictions under Count Three of the indictment on the ground that it failed to charge an offense with adequate specificity and that the evidence at trial was insufficient to sustain convictions against them.

### A. *Specificity of the Charging Language*

Count Three of the superseding indictment charged appellants with knowingly and willfully conspiring to injure and destroy "specific property belonging to the government of the United Kingdom ... to wit: One or more of a total of less than seventy military helicopters of the Lynx, Gazelle, Puma, Chinook and Wessex class, based at the Royal Air Force Station at Aldergrove, Northern Ireland" in violation of 18 U.S.C. § 956.[7] Appellants claim that this language does not satisfy the specificity requirement of § 956(b), which states that an indictment under the statute must describe the "specific property" that the defendants conspired to injure or destroy. Appellants argue that the indictment is defective because it identifies the targeted property by class—a quantity of military helicopters stationed at a particular location—rather than more particularly.

We concur in the thoughtful analysis of the magistrate judge adopted by the district court on this issue. *See United States v. Johnson*, 738 F.Supp. 591, 592–94 (D.Mass.1990). From the legislative history of § 956 the magistrate judge concluded that the particularity requirement of § 956(b) was added to shield a discrete class of conduct from the reach of § 956(a), namely, constitutionally protected activity, such as a pro-PIRA speech or a PIRA fundraising event, that only indirectly implicates the injury of foreign property. *See id.* at 593.

Viewed in this light, the magistrate judge suggested, "the specificity require-

---

**7.** 18 U.S.C. § 956, "Conspiracy to injure property of a foreign government," provides:

(a) If two or more persons within the jurisdiction of the United States conspire to injure or destroy specific property situated within a foreign country and belonging to a foreign government or to any political subdivision thereof with which the United States is at peace, or any railroad, canal, bridge, or other public utility so situated, and if one or more

such persons commits an act within the jurisdiction of the United States to effect the object of the conspiracy, each of the parties to the conspiracy shall be fined ... or imprisoned ... or both.

(b) Any indictment ... under this section shall describe the specific property which it was the object of the conspiracy to injure or destroy.

ment in Section 956 does not mean that the property which is the object of the conspiracy to destroy needs to be described in minute detail." *Id.* To require more specificity than the number, class, and location of the targeted property "would be to subvert the purpose and intent of the statute, in effect, to render it meaningless." *Id.* Indeed, in the case before us, the charging language describes the vulnerable property with as much specificity as did the conspirators themselves. At no time did appellants single out a particular helicopter to be destroyed. Rather, the record reflects their commitment to the destruction of British military helicopters in Northern Ireland, generally.

### B. *Sufficiency of the Evidence*

██ Appellants also assert that the evidence at trial was insufficient to warrant guilty verdicts against them on Count Three. Appellants' sufficiency challenge on Count Three tracks their specificity claim and, accordingly, fails. Although the evidence at trial established appellants' interest in an indeterminate number of helicopters comprised of several classes, rather than in any particular machine, this was all that was required. And it is beyond question that, taking the evidence and all reasonable inferences therefrom in the light most favorable to the government, the jury could have found beyond a reasonable doubt that appellants sought to destroy a class of British military helicopters stationed in a particular location. *See United States v. Zannino*, 895 F.2d 1, 9 (1st Cir. 1990) (sufficiency standard of review).

The jury had before it the transcript of the December 15, 1988 conversation in which Reid introduced Johnson to Quigley, and Quigley requested Johnson's assistance in devising an anti-helicopter missile system. As well, it had a copy of a 1988 article published by the political arm of the

PIRA and seized from Reid's apartment, recounting the destruction of a British army helicopter in Northern Ireland by the Irish Republican Army and describing the helicopters as "a priority target." From the apartment of defendant Hoy, a coconspirator in this case, *see supra* note 1, the FBI seized a handwritten list of the five classes of helicopters stationed at the Royal Air Force Station in Aldergrove, Northern Ireland, and a copy of *British Military Helicopters*, both of which were presented to the jury. The government also introduced a variety of direct evidence, in the form of intercepted conversations, of the efforts of Reid and Quigley to obtain access to rocket motors through a rocketry society. Taking this and the rest of the evidence in the light most favorable to the government, we must uphold the jury's guilty verdicts against appellants on Count Three.

### V. *Count Four: First Amendment Challenge to 18 U.S.C. § 957*

Johnson, on behalf of himself and Quigley,[8] claims that 18 U.S.C. § 957, the statute underlying Count Four of the indictment, violates the First and Fourteenth Amendments of the Constitution because it is "substantially overbroad in its formulation and impermissibly vague in its application."[9] The thrust of his argument is that § 957 threatens "the core constitutional guarantees of unfettered political association and expression...." Johnson Opening Brief at 33. Briefing neither the overbreadth nor vagueness arguments in accordance with the substantial law on point, Johnson instead merges the two in a series of sketchy complaints. We consider the overbreadth and vagueness arguments separately.

### A. *Overbreadth*

██ Johnson does not argue that his possession and control of the Harwich labo-

---

8. In his brief, Quigley incorporates Johnson's argument on this issue in its entirety. For ease of reference, however, we discuss the claim as if made only by Johnson.

9. 18 U.S.C. § 957 provides for the punishment of one who "in aid of any foreign government,

knowingly and willfully possesses or controls any property or papers used or designed or intended for use in violating any penal statute, or any of the rights or obligations of the United States under any treaty or the law of nation."

ratory, in which he carried out research and development of PIRA weaponry, is protected expression or that § 957 was invalidly applied to him. Rather, he appears to concede that his conduct falls within the statute's "legitimate sweep." *New York v. Ferber*, 458 U.S. 747, 770, 102 S.Ct. 3348, 3362, 73 L.Ed.2d 1113 (1982) (quoting *Broadrick v. Oklahoma* 413 U.S. 601, 615, 93 S.Ct. 2908, 2918, 37 L.Ed.2d 830 (1973). Johnson is, nevertheless, entitled to raise an overbreadth challenge, since a statute whose terms are so broad as to chill a "substantial" amount of protected speech of parties not before the court, *New York State Club Ass'n v. City of New York*, 487 U.S. 1, 14, 108 S.Ct. 2225, 2234, 101 L.Ed.2d 1 (1988), may not be enforced against anyone, even one whose activity the statute legitimately governs. *See id.* at 11, 108 S.Ct. at 2233; *Ferber*, 458 U.S. at 770, 102 S.Ct. at 3361 (quoting *Broadrick*, 413 U.S. at 615, 93 S.Ct. at 2917); *Magill v. Lynch*, 560 F.2d 22, 29 (1st Cir.1977).

Johnson's First Amendment attack upon § 957 depends, therefore, upon the strength of his showing that the statute chills a substantial amount of protected expression. Toward this end, he asserts that § 957 threatens the "basic right to speak out and participate in matters of international concern," and provides examples, relegated to a footnote in his Reply Brief, of conduct that he maintains is impermissibly compromised by the statute's broad language. His examples include the possession of blueprints for a robbery planned by someone else and the possession of a treatise on violent revolution, where the possessor knows but does not share the author's intent. Possession of Abbie Hoffman's *Steal This Book,* is, according to Johnson, likewise chilled by § 957, presumably since the title of the work suggests an intent to violate a penal statute. At oral argument Johnson added two examples of actual individuals whose protected expression would fall within the statute's prohibitions: a university professor possessing pro-PLO literature, and a lawyer, Johnson's counsel, holding pro-Israeli materials.

Even under Johnson's expansive reading of the reach of § 957, we are not persuaded that the likely impact of possible unconstitutional applications is sufficient to invalidate the statute, broadly worded though it may be. "It is clear ... that the mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to overbreadth challenge." *City Council v. Taxpayers For Vincent*, 466 U.S. 789, 800, 104 S.Ct. 2118, 2126, 80 L.Ed.2d 772 (1983). *See also Ferber*, 458 U.S. at 770, n. 25, 102 S.Ct. at 3362, n. 25; *Broadrick*, 413 U.S. at 618, 93 S.Ct. at 2919. Rather, a "substantial overbreadth" determination requires that the party launching the facial attack "demonstrate from the text of [the statute] and from actual fact that a substantial number of instances exist in which the [statute] cannot be applied constitutionally." *New York State Club Ass'n*, 487 U.S. at 14, 108 S.Ct. at 2234. *See also Taxpayers For Vincent*, 466 U.S. at 802, 104 S.Ct. at 2127.

Johnson's examples fall short of the requisite substantiality showing. Abbie Hoffman's work remains popular, and we have been directed to no other books which, since the enactment of § 957 in 1948, have been chilled by the statute. Moreover, § 957 evidently has had no chilling effect upon the political speech of either the university professor or lawyer described by Johnson at argument. Indeed, that § 957 apparently has never been enforced until now, and that, since 1948, Americans have regularly expressed their support of subversive ideas or institutions, often "in aid of a[ ] foreign government," § 957, counsels against a finding of substantial overbreadth in this case. *See New York State Club Ass'n*, 487 U.S. at 14, 108 S.Ct. at 2234, and *Taxpayers For Vincent*, 466 U.S. at 802, 104 S.Ct. at 2127 (refusing to find substantial overbreadth where litigants failed to develop adequate record of speech-deterrent impact on third parties).

We are unpersuaded by Johnson's First Amendment claim, not only because he has failed to demonstrate that § 957 substantially threatens the protected activity of parties not before the court, but also, and more importantly, because, as we read it,

the statute does not impermissibly interfere with protected speech. Until now, there has been no challenge to, and no occasion to interpret, § 957. The instant case, however, presents us with both. We therefore turn to our interpretation of the statute.

We agree with the district court that the objective of § 957 is "to prohibit certain conduct, not to impinge on constitutionally protected speech." *United States v. Johnson,* 738 F.Supp. 594, 596 (D.Mass.1990). It is well settled that "the state may ... curtail speech when necessary to advance a significant and legitimate state interest," where it does so in a viewpoint-neutral manner unrelated to the suppression of ideas. *Taxpayers For Vincent,* 466 U.S. at 804, 104 S.Ct. at 2128.[10] In the case before us, it is undisputed that the federal government has significant and legitimate interests in curbing criminal activity undertaken in aid of a foreign power and in ensuring the observance of its treaty obligations.

We believe that § 957 furthers this interest with only incidental impact upon First Amendment liberties. Punishment for the possession of papers or property is predicated not upon the subversive message of such materials, but upon their actual or intended use in the commission of a crime or the violation of an international obligation of the United States in aid of a foreign government.

In our view, the plain import of the "used or intended for use" qualification in § 957 is to limit punishment under the statute to cases where the papers or property at issue fall within an exceedingly narrow category of material, what might be called instrumentalities of crime.[11] This would include items obviously used only for criminal purposes, such as counterfeit dollars and the printing press on which they are produced. The statute also would cover the possession of less telling materials, such as papers relating to the design of a bomb and property comprising the components with which it is to be built, where the possessor intends to use these items in violating a penal statute or an international obligation of the United States in aid of a foreign government.[12]

One may not, on the other hand, be prosecuted under § 957 for exercising the "right to speak out and participate in matters of international concern," for possessing a manifesto urging "violent revolution," or for owning pro-Israeli or pro-PLO literature, as Johnson suggests. Nor, indeed, may one be subject to liability for the possession of any paper or property merely advocating lawless activity.[13] We, therefore, are satisfied that to the extent that

---

**10.** *See also United States v. O'Brien,* 391 U.S. 367, 376, 88 S.Ct. 1673, 1678–79, 20 L.Ed.2d 672 (1968) (where "'speech' and 'nonspeech' elements are combined in the same course of conduct, a sufficiently important government interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms"); *Texas v. Johnson,* 491 U.S. 397, 407, 109 S.Ct. 2533, 2540, 105 L.Ed.2d 342 (1989) (limiting application of lenient *O'Brien* rule "to those cases in which 'the governmental interest is unrelated to the suppression of free expression'" (quoting *O'Brien,* 391 U.S. at 377, 88 S.Ct. at 1679)).

**11.** In so construing § 957, we are guided by the principle that "application of the overbreadth doctrine is 'strong medicine' that should be invoked only 'as a last resort,'" *Secretary of State of Maryland v. J.H. Munson Co.,* 467 U.S. 947, 958, 104 S.Ct. 2839, 2848, 81 L.Ed.2d 786 (1984) (quoting *Broadrick,* 413 U.S. at 613, 93 S.Ct. at 2916), as well as our duty to construe a federal statute to avoid constitutional problems where such a construction is reasonable and not con-

trary to congressional intent. *See DeBartolo Corp. v. Florida Gulf Coast Building & Constr. Trades Council,* 485 U.S. 568, 575, 108 S.Ct. 1392, 1397, 99 L.Ed.2d 645 (1988); *Arnett v. Kennedy,* 416 U.S. 134, 162, 94 S.Ct. 1633, 1648, 40 L.Ed.2d 15 (1974).

**12.** We reject Johnson's argument that the statute fails to specify whose "design" or "intent" controls the § 957 liability determination. A fair reading of the statute makes clear that liability turns upon the *possessor's* intent to violate either a penal statute or an international obligation of the United States.

**13.** Johnson's objection to the absence of an "imminence" requirement from § 957 is, therefore, inapposite. *See* Johnson Reply Brief at 20, relying on *Brandenburg v. Ohio,* 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969) (state may not punish advocacy of illegal or violent action unless "such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." *Id.* at 447, 89 S.Ct. at 1829).

§ 957 encroaches upon the exercise of free speech, it does so in furtherance of substantial government interests and in a manner unrelated to the suppression of ideas.[14]

We cannot say that there will never be a case in which § 957, even as construed by us, might be applied impermissibly. To warrant facial invalidation, though, "the overbreadth of a statute must not only be real, but substantial as well...." *Ferber,* 458 U.S. at 770, 102 S.Ct. at 3362 (quoting *Broadrick,* 413 U.S. at 615, 93 S.Ct. at 2918). Having already addressed the inadequacy of Johnson's substantiality showing, we "must assume that 'whatever overbreadth may exist should be cured through case-by-case analysis of the fact situations to which [the statute's] sanctions ... may not be applied.'" *New York State Club Ass'n,* 487 U.S. at 14, 108 S.Ct. at 2235 (quoting *Broadrick,* 413 U.S. at 615–16, 93 S.Ct. at 2918). More drastic measures than this, we are obliged to leave to Congress.

**B. Vagueness**

▮ Johnson argues that § 957 is impermissibly vague in its application in violation of the Due Process Clause of the Fourteenth Amendment. We find that Johnson lacks standing to raise this claim.

It is settled beyond controversy that one whose conduct is clearly governed by a statute may not successfully challenge it for vagueness. *See Parker v. Levy,* 417 U.S. 733, 756, 94 S.Ct. 2547, 2561, 41 L.Ed.2d 439 (1974); *United States v. Morison,* 844 F.2d 1057, 1071 (4th Cir.1988) (citing *Levy, id.*). Johnson does not argue

that § 957 was unfairly applied to him.[15] He maintains, instead, "that a defendant may ... raise a facial challenge to § 957 on vagueness grounds," where First Amendment freedoms are involved. In *Levy,* a case which did implicate First Amendment liberties, the Supreme Court rejected precisely this argument, characterizing it as "a blending of the doctrine of vagueness with the doctrine of overbreadth ... not ... supported by prior decisions of this Court." 417 U.S. at 756, 94 S.Ct. at 2561. We therefore do not reach the merits of Johnson's due process claim.

**VI. *Quigley's Claims: Variance, Sufficiency, Severance***

Appellant Quigley seeks reversal of the verdicts returned against him on a variety of grounds independent of those asserted by appellants as a group. He maintains that a prejudicial variance between the conduct charged in Count One and the evidence adduced at trial denied him a fair trial, that the evidence was insufficient to support his convictions on Counts One and Four, and that the district court's denial of his motion for severance deprived him a fair trial.

**A. The Variance and Sufficiency Claims**

▮ Quigley argues that a prejudicial variance between the conspiracy charged in Count One[16] and the evidence adduced at trial produced reversible error. Count One describes a single conspiracy, spanning the years between 1981 and 1989, "to further the forcible reunification of

---

**14.** Consider, by way of contrast, the ban on "all First Amendment activities" from the terminal area of Los Angeles International Airport, invalidated on overbreadth grounds in *Board of Airport Commissioners of the City of Los Angeles v. Jews For Jesus,* 482 U.S. 569, 107 S.Ct. 2568, 96 L.Ed.2d 500 (1987). In that case, the Supreme Court invalidated the resolution because it was an "absolute prohibition of speech" justified by "no conceivable governmental interest...." *Jews For Jesus,* 482 U.S. at 575, 107 S.Ct. at 2572. Similarly, the *Broadrick* Court rejected petitioner's facial overbreadth challenge to a statute forbidding state employees from engaging in certain partisan political activity on grounds that the statute was "not ... directed at particular groups or viewpoints," and that it sought "to

regulate political activity in an even-handed and neutral manner." 413 U.S. at 616, 93 S.Ct. at 2918.

**15.** The district court, adopting the report and recommendation of the magistrate judge, concluded, and we agree, that the statute was validly applied to Johnson and Quigley for their possession of the Harwich laboratory. *See Johnson,* 738 F.Supp. at 597–98.

**16.** Count One charges all three appellants with conspiracy to export defense materials and services illegally in violation of 18 U.S.C. § 371 ("Conspiracy to commit offense or to defraud United States") and 22 U.S.C. § 2778.

Northern Ireland and the Republic of Ireland by means of an armed insurrection waged by the Provisional Irish Republican Army against British and Northern Ireland authorities." According to Quigley, however, the evidence at trial proved the existence of two conspiracies, one directed at the export of defense articles and services for the perfection of remote-control bombs, and another aimed at the export of a missile system conceived specifically for the purpose of destroying British military helicopters.

Quigley insists that there was insufficient evidence of his involvement in any pre–1988 arms export activity to support his conviction for the broad conspiracy he finds charged in Count One. In *United States v. Glenn*, 828 F.2d 855 (1st Cir. 1987), we adopted a three part test for determining whether a prejudicial variance exists as to any defendant. We determine first whether there is "evidence sufficient to permit a jury to find the ... agreement that the indictment charges," *Id.* at 858. Where no such evidence exists, we consider whether the evidence is "sufficient to permit a jury, under a proper set of instructions, to convict the defendant of a related, similar conspiracy." *Id.* Where such evidence exists, we ask whether the variance amounts to "harmless error." *Id.*

Because we answer the first of the *Glenn* inquiries in the affirmative, we need not address the other two. On December 15, 1988, Quigley asked Johnson, over a pay telephone, to assist him in the production of a missile system "to counteract ... low flying helicopters." Quigley adverted to his awareness of Johnson's pre–1988

work perfecting PIRA weaponry, including a laser-detonation mechanism for the remote control bombs, and to his own past and ongoing efforts on this score.[17]

This conversation permits an inference that Quigley not only knew about, but also participated in, the pre–1988 operations. At the least, it shows that Quigley recognized that the post–1988 missile system on which he worked was simply the most recent in a series of projects undertaken by the conspirators to assist the PIRA in its attacks against British interests in Northern Ireland. Thus, whatever his particular involvement in the pre–1988 work, we think the record at a minimum shows a "tacit understanding," *Glenn*, 828 F.2d at 858, on Quigley's part, that he was joining an extant scheme to bring about the forcible reunification of Ireland. Quigley was properly charged, and found culpable for, his membership in the broad conspiracy described in Count One.

We find no merit to Quigley's argument that insufficient evidence existed to find that he committed overt acts in furtherance of this conspiracy. Quigley's concession that "the exhibits seized from Quigley and Hoy showed that they had done the preliminary design of a rocket system to a point where construction could begin," is, by itself, enough to prove his involvement. Quigley has failed to demonstrate that a reasonable jury, taking all of the evidence, and reasonable inferences therefrom, in the light most favorable to the government, could not have returned a guilty verdict against him for the offense charged. *Zannino*, 895 F.2d at 9.[18]

---

17. For example, Quigley told Johnson, "As you probably guessed by now, I kind of, we're experiencing a slight technical problem;" "and you kinda helped us out of these situations before and ah, we're looking to you once again"; "[a]s I was saying ... we're developing a new system...."; "it's a much different system.... But it's what's available to us as you well knew so some of these ... use radar, infra-red, acoustic ... magnetic, etcetera"; "[s]o we're kinda looking to you if, if possible, could you look into that field for us?" "As [Maguire] said to me ... yourself and him we're always about ten years ahead of everybody else."

18. We also reject Quigley's sufficiency argument with respect to Count Four, which charged him with aiding and abetting Johnson in the possession and control of the Harwich laboratory. Quigley concedes that the evidence against him "consisted ... of the facts that [he] and Johnson had discuss[ed] with each other various electronic projects in the development of a rocket system; [that] their correspondence covered some details of technical work Johnson had done [,] and that Quigley visited the Johnson home ... and viewed ... Johnson's ... 'laboratory workshop,'" where his fingerprints were found. Quigley Brief at 31. This evidence is sufficient to permit a reasonable jury to find

## B. *The Motion For Severance*

 Quigley argues that the district court's denial of his motion for severance under Fed.R.Crim.P. 14 violated his Sixth Amendment right to a fair trial.[19] His claim is hewn from the same wood as his prejudicial variance claim: because he was not involved in the pre–1988 exportation of remote-control bomb components, he was substantially prejudiced by the joint trial of all three appellants in this case.[20]

Our conclusion that Quigley was properly charged and convicted for the overall scheme alleged in Count One effectively resolves the severance claim as well. Because Quigley's involvement as a conspirator could be found to encompass both the pre- and the post–1988 exportation, there was no need to exclude evidence relevant to the pre–1988 activity from the jury's determination of his guilt. The trial court's refusal to grant Quigley his own trial, or to compartmentalize the evidence at the joint trial as Quigley would have preferred, therefore, cannot be deemed an abuse of discretion. *See United States v. Natanel,* 938 F.2d 302, 308 (1st Cir.1991) (review of denial of severance motion is for abuse of discretion).

## VII. *Reid's Claims: Sufficiency of the Evidence* [21]

Reid argues that the verdicts returned against her on Counts One and Three were not supported by adequate evidence of her knowledge of the objectives underlying the conspiracies charged. The indictment identifies the objective underlying the arms exportation conspiracy charged in Count One

as the furtherance of "the forcible reunification of Northern Ireland and the Republic of Ireland by means of an armed insurrection waged by the [PIRA]." It describes the purpose of the anti-helicopter agreement charged in Count Three as the injury and destruction of British military helicopters stationed at the Royal Air Force Station in Aldergrove, Northern Ireland.

 It is axiomatic that to be found guilty of conspiracy, a defendant must be found to have had knowledge of, and an intent to further, the objectives of the conspiracy. *See United States v. Rengifo,* 858 F.2d 800, 808 (1st Cir.1988); *United States v. Marsh,* 747 F.2d 7, 12 (1st Cir.1984). To obtain a guilty verdict against a defendant charged with conspiracy, however, the government need not show that the defendant concurred in every detail of the underlying objective of the conspiracy; nor need it prove that she appreciated the full extent of the illegal enterprise. *See United States v. Rivera–Santiago,* 872 F.2d 1073, 1079 (1st Cir.1989). All that is required is a showing "that [the defendant] appreciated 'the essential nature of the plan,' and freely determined to associate [her]self with it." *United States v. Ruiz,* 905 F.2d 499, 506 (1st Cir.1990) (citation omitted) (quoting *Rivera–Santiago,* 872 F.2d at 1079 (quoting *Blumenthal v. United States,* 332 U.S. 539, 557, 68 S.Ct. 248, 256, 92 L.Ed. 154 (1947))).

 On Count One, there was more than adequate evidence upon which a reasonable jury might have found Reid not only to be "connected" with the charged exportation plan, but to have understood

---

that Quigley affirmatively participated in the Harwich "venture," and so aided and abetted in the offense charged. *See Nye & Nissen v. United States,* 336 U.S. 613, 619, 69 S.Ct. 766, 769, 93 L.Ed. 919 (1949); *United States v. Lema,* 909 F.2d 561, 569 (1st Cir.1990).

19. Rule 14 provides, in relevant part:
If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants ... for trial together, the court may ... grant a severance of defendants or provide whatever other relief justice requires.

20. Quigley objects to the introduction against him of the Johnson–Maguire "Clondalkin letters," "the Armagh device," (a remote-control

bomb recovered from a PIRA-sponsored explosion), the FBI videotape of an explosion caused by a simulated PIRA bomb, a 1985 newspaper article published by the PIRA, and evidence of appellant Johnson's acquisition of bomb components.

21. We have considered Reid's claim that the district court committed reversible error in refusing to charge the jury precisely as she requested, and find it to be without merit. *See United States v. Passos Paternina,* 918 F.2d 979, 984 (1st Cir.1990) (citing *United States v. Gibson,* 726 F.2d 869, 874 (1st Cir.1984)).

fully and joined wholeheartedly in it. The Johnson–Maguire "Clondalkin letters," which address the design, construction, and export of remote-control bombs, contain numerous references to Reid's direct participation in the exportation scheme.

The letters describe Reid carrying a component for a bomb in June, 1983, to "Sean," an associate of Maguire in Northern Ireland, and to her delivering a message from "Sean" to Johnson that "Sean" was in need of handguns. The letters also state that Reid was, in the words of Johnson and Maguire, "doing a fine job," "really taking to electronics," "know[ing] her way around pretty well," becoming "a real asset," being "dazzled" by "Sean," and "doing the necessary gopher work." And, though, in their letters, Johnson and Maguire more often refer to Reid as "the bird," "the girl," or "our young friend," rather than by name, a reasonable jury certainly could have found that this person, and "the young lady ... named Chris" and "C. Reid," were one and the same.

The evidence also established that in 1983 Reid gave a false address and social security number in order to secure a post office box in her name for use by Johnson and Quigley to insure the continued security of their correspondence. Seized from Reid's apartment was a note requesting her to ship "as soon as possible" a PRO 30 scanner, a variant of which was recovered from a PIRA car bomb detonated in Northern Ireland in 1985. The note stated that "the rest of the gifts can follow at intervals as usual." In addition, seized from Reid's apartment was a letter from one "Liam," asking Reid to warn Johnson that the Irish authorities had seized his letters

to Maguire and to urge him not to respond to any letter without being certain of its authenticity.

As for Reid's knowledge of the objective of the anti-helicopter conspiracy, we need only point to her arrangement of and participation in the telephone conversation of December 15, 1988, in which Quigley requested Johnson's help in developing a missile system to destroy British helicopters. That Reid introduced Johnson to Quigley on the occasion of this exchange and, thereafter, corresponded with Quigley regularly on the subject of her joining a rocketry society so that she might learn to operate rocket motors, would permit a reasonable jury to infer her knowledge and approval of the proposed bombing of the helicopters at Aldergrove.

Given the profusion of evidence of Reid's direct participation in the conspiracies charged, we cannot say that the jury unreasonably concluded that she understood and assented to their underlying purposes.[22] *See Zannino*, 895 F.2d at 9.

## VIII. *The Johnson and Quigley Sentences*

Johnson and Quigley attack the legality of their sentences on several fronts.[23] We consider each in turn.

### A. Sophisticated Weaponry

The government and appellants agree that U.S.S.G. § 2M5.2, "Exportation of Arms, Munitions, or Military Equipment or Services Without Required Validated Export License," was the applicable guideline for determining the sentences of Johnson and Quigley on Counts One and Two.[24]

---

**22.** In response to Reid's argument that the out-of-court statements of coconspirators standing alone are insufficient to prove knowing participation beyond a reasonable doubt, we note, and Reid concedes, that neither the Supreme Court nor this circuit has ruled on this issue. We find, however, that adequate evidence existed on which the jury reasonably could have found knowledgeable participation on Reid's part, even ignoring the written and spoken statements of Johnson and Quigley.

**23.** The district court sentenced Johnson to 60 months of incarceration on Count One, 120

months on Count Two, 36 months on Count Three, and 120 months on Count Four, all to be served concurrently. It sentenced Quigley to a 60 month term of incarceration on Count One, a 36 month term on Count Three, and a 96 month term on Count Four, all to be served concurrently.

**24.** Congress amended § 2M5.2 in 1990. In its prior form, and as applied to appellants, § 2M5.2 set the base offense level at the greater of "(1) 22, if sophisticated weaponry was involved; or (2) 14."

Johnson, however, on behalf of himself and Quigley, objects to the district court's determination that appellants' conduct involved a conspiracy to export "sophisticated weaponry" such that a base offense level of 22, rather than 14, was appropriate. The gist of appellants' argument is that the "defense articles" forming the basis of the illegal exportation offense charged in Count One may not be classified as "sophisticated" or, for that matter, as "weaponry," since "virtually every item [appellants were] alleged to export was readily available at hobby shops and consumer-oriented electronics stores, and ... had common, nonmilitary applications." Johnson Opening Brief at 38.

We are unpersuaded, to say the least, by appellants' cast of the facts. It is precisely their skill in making extraordinary the ordinary that warrants a finding of "sophistication" under § 2M5.2. As the Probation Department suggested, in a report adopted by the district court, "the ability to take readily available items and ... using knowledge and skills gained through extensive education and on the job training ... rework them so that they become a radio controlled detonating device," underscores the sophistication of appellants' handiwork.[25] *See also United States v. Nissen,* 928 F.2d 690, 694 (5th Cir.1991) (components " 'involved' in a tangible way with 'sophisticated weaponry,' " are "sophisticated weaponry" within meaning of § 2M5.2).

When reviewing a sentence under the guidelines, we accept the factual findings of the district court unless they are clearly erroneous. *See* 18 U.S.C. § 3742(e); *United States v. Pilgrim Market Corp.,* 944 F.2d 14, 15–16 (1st Cir.1991). There was no error in the district court's finding that appellants dealt in "sophisticated weaponry."

**B. The Upward Departure**

Appellants also argue that the district court wrongly departed upward from the guidelines sentencing range by considering factors that are not, according to appellants, "aggravating circumstances" permitting such departures. *See* U.S.S.G. § 5K2.0.

At disposition, the district court specified the reasons for its departure decision. It referred to the "cool, deliberate, calculated" quality of appellants' conversations regarding the development of weaponry in aid of the PIRA and the utter lack of "any expression of remorse or contrition" in these conversations. The court noted that appellants discussed the development of weapons likely to result in injury and death like "two trained individuals ... discussing a mechanical problem that they had to solve." As well, the judge repeatedly referred to "the potential for death to innocent people" produced by appellants' activities. The court also referred to the "extreme" amount of "planning and sophistication" in the arms export conspiracy; the "multiple occurrences" of illegal conduct; and the threat posed by appellants' arms export conspiracy to an American security interest, namely, the peaceful resolution of the conflict in Northern Ireland. In addition, the court characterized appellants' conduct as "terrorism, flat out," and reckoned this factor in its departure calculation.

Our review of departure decisions follows a three-step analysis. *See United States v. Aymelek,* 926 F.2d 64, 69 (1st Cir.1991); *United States v. Diaz–Villafane,* 874 F.2d 43, 49 (1st Cir.1989). We first inquire whether, as a matter of law, the circumstances relied upon by the sentencing court "are of a kind or degree that ... may appropriately be relied upon to justify departure." *Diaz–Villafane, id.* Second, "we determine whether the circumstances, if conceptually proper, actually exist in the ... case." *Id.* Lastly, we measure the reasonableness of the direction and degree of the departure. *See id.* Regarding the third step, "appellate review must occur with full awareness of, and respect for, the trier's superior 'feel' for

---

**25.** Because we were not provided with the Addendum to the Presentence Report for appellant Johnson, in which this statement appears, we have excerpted it from the government's Consolidated Brief at 101–02, n. 75.

the case." *Id.* at 49–50; "[w]e will not lightly disturb decisions to depart...." *Id.* at 50.

 Under the first step of the *Diaz–Villafane* analysis, we find that, as a matter of law, each of the circumstances relied upon by the court was an appropriate basis for the departure. Section 5K2.8 of the guidelines specifically authorizes a departure from the guidelines range for "unusually ... cruel" or otherwise "extreme conduct". More generally, § 5K2.0 provides that the sentencing court may impose a sentence outside the range recommended by the guidelines if it finds any aggravating or mitigating circumstance " 'of a kind or to a degree not adequately taken into consideration by the Sentencing Commission in formulating the guidelines.' " § 5K2.0 (quoting 18 U.S.C. § 3553(b)).

While the district court did not specifically advert to §§ 5K2.8 or 5K2.0, we are free to consider their applicability. *See Acha v. United States,* 910 F.2d 28, 30 (1st Cir. 1990); *Doe v. Anrig,* 728 F.2d 30, 32 (1st Cir.1984) (court of appeals free to affirm based on any ground supported by the record). The court did rely expressly upon § 5K2.14, which authorizes departures for the endangering of the public welfare and national security, and on § 2M5.2, which permits departures where an extreme amount "of planning or sophistication" or "multiple occurences," or a threat to national security is found. § 2M5.2, comment. (n.2).

Appellants argue that the district court erred in deeming the threat to national security and the potential for death and destruction produced by appellants' conduct "aggravating circumstances," because, according to appellants, these factors were adequately taken into account by the Sentencing Commission in establishing the guidelines. Appellants note that the Arms Export Control Act underlying Counts One and Two of the indictment was enacted in "furtherance of world peace and the security and foreign policy of the United States," 22 U.S.C. § 2778(a)(1), and that § 2M5.2 of the guidelines, prescribing the base offense level for the arms export offenses, presumes the existence of a threat to national security and the potential for death and destruction. They similarly attack the court's reliance upon appellants' terroristic purpose in the departure determination, claiming that their convictions for the offense charged in Count Four were predicated upon terrorist activity, namely, their "aiding a faction and body of insurgents."

We find no merit to these arguments. Their logic would require that an internationally trained terrorist bent on murdering scores of innocent civilians be sentenced no more severely than an unlicensed arms dealer; and that one who would provide arms to a body of insurgents be sentenced no more harshly than one who would supply them with drug paraphernalia. The guidelines plainly preclude such results. Section 5K2.0 permits an upward departure where factors—a threat to national security or terroristic purpose, for example—are present "to a degree substantially in excess of that which ordinarily is involved in the offense of conviction," or in any configuration " 'not *adequately* taken into consideration' " by the Sentencing Commission, (quoting 18 U.S.C. § 3553(b); emphasis added).

Turning to the second and third of the *Diaz–Villafane* steps, we are satisfied that there was ample evidence, much of it set forth in the foregoing portions of this opinion, to support the district court's findings on the factors justifying upward departure. In addition, we conclude that the degree of the departure, which effectively doubled Johnson's sentence, was reasonable.

"Although 'there appears to be some inherent tension in the guidelines themselves as to the extent to which departure is permissible,' we read the Guidelines as envisioning considerable discretion in departure decisions...." *Diaz–Villafane,* 874 F.2d at 52 (citation omitted) (citing S.Rep. No. 225, 98th Cong., 2d Sess. (1984), *reprinted in* 1984 U.S.Code Cong. & Admin.News 3182, 3235 (purpose of Guidelines "is to provide a structure for evaluating the fairness and appropriateness of the sentence for an individual offender, not to eliminate

the thoughtful imposition of individualized sentences")).

In *Diaz–Villafane* we upheld a departure that more than tripled defendant's maximum term. As we stated in that case, while "cognizant that departures should be the exception rather than the rule, we must nonetheless defer, within broad limits, to the trial judge's intimate familiarity with the nuances of a given case." 874 F.2d at 52 (citation omitted). Because we do not find the degree of departure in this case to be "outside the universe of acceptable punishments," *id.*, we defer to the district court's decision.

## C. The Ex Post Facto Claim

■ Appellants argue that the district court's reliance on the guidelines policy statement regarding terrorism, § 5K2.15, violates the Ex Post Facto Clause of Article I of the Constitution because the statement was issued in November 1989, after the criminal acts charged in the indictment were complete. We agree that the court improperly relied upon the statement, but we find this error to be of no consequence.

The bare fact that the district court applied § 5K2.15 to pre-November 1989 conduct does not mean that an ex post facto punishment was visited upon appellants. In the sentencing arena, an ex post facto law is one that " 'changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed.' " *Miller v. Florida*, 482 U.S. 423, 429, 107 S.Ct. 2446, 2450, 96 L.Ed.2d 351 (1987) (quoting *Calder v. Bull*, 3 Dall. 386, 390, 1 L.Ed. 648 (1798)).

Appellants have made no showing that the court's reliance upon § 5K2.15 resulted in the imposition of a more severe punishment than would otherwise have been ordered. As we have indicated, the trial court articulated a number of legitimate bases, quite apart from the terrorism factor, for its departure decision. And, to the extent that the court sought to consider appellants' terrorism an aggravating circumstance warranting an increased sentence, it was free to do so even before the publication of § 5K2.15. Upon issuing

§ 5K2.15, the Sentencing Commission commented that "[t]his amendment does not make a substantive change. Such conduct is … included in … other policy statements." U.S.S.G.App. C, at C.292 (Nov. 1991 ed.). *See, e.g.,* § 5K2.0 ("[c]ircumstances that may warrant departure from the guidelines pursuant to this provision cannot, by their very nature, be comprehensively listed and analyzed in advance").

We conclude that the trial court's reference to § 5K2.15 at disposition did not violate appellants' constitutional right to be free of ex post facto punishment.

## D. *Other Sentencing Issues*

■ Appellants argue that the district court erred in using the arson guideline, § 2K1.4, to determine their sentences on the Count Four convictions. *See* 18 U.S.C. § 3553(b) ("[i]n the absence of an applicable sentencing guideline … the court shall … have due regard for the relationship of the sentence imposed to sentences prescribed by guidelines applicable to similar offenses and offenders…."). This issue was not preserved for appeal, Johnson apparently having made no objection in the district court, and Quigley having explicitly approved the use of § 2K1.4 in his Sentencing Memorandum.

■ Appellants also contend the trial court erred in refusing to depart downward under § 2X1.1(b)(2) for an incomplete conspiracy. The record is ambiguous as to whether this claim, too, was waived; because the issue requires little discussion, however, we nevertheless choose to address it.

A trial court's discretionary refusal to depart downward from the guidelines sentencing range is not appealable. *United States v. Lauzon*, 938 F.2d 326, 330–31 (1st Cir.1991); *United States v. Jimenez–Otero*, 898 F.2d 813, 815 (1st Cir.1990). We have appellate jurisdiction only "where it is unclear whether a district court's refusal to depart was based on an exercise of discretion or based upon the district court's finding that it could not depart as a matter of law." *Lauzon*, at 330.

We conclude that review is impermissible here. Appellants and the government each argued the appropriateness of a § 2X1.1 departure based on the specific facts of this case. The court declined to depart downward on this ground in open court and on the record. *See* Tr. Disposition at 14. We have no reason to believe that its decision resulted from anything other than a discretionary determination that the government had the better of the two arguments.

The judgment of the district court is *affirmed.*